Attorneys for Plaintiff:
**THE RANDO LAW FIRM P.C.**
6800 Jericho Turnpike
Suite 120W
Syosset, NY 11791
 (516) 799-9800

**CULLEN AND DYKMAN LLP**
100 Quentin Roosevelt Boulevard
Garden City, NY 11530-4850
(516) 357-3700

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

| | | |
|---|---|---|
| FDNY BATTALION COMMANDER MICHAEL MCGRATH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | |
| | : | CIVIL ACTION NO. 17-CV-1461 |
| MARILYN ARROYO, STEVEN RUSSO, JAMES LEONARD, DANIEL NIGRO, MAYOR BILL DE BLASIO, THE FIRE DEPARTMENT OF THE CITY OF NEW YORK and THE CITY OF NEW YORK, | : : : : | |
| Defendants. | : | |

------------------------------------------------------------X

## **COMPLAINT**

Plaintiff, FDNY BATTALION COMMANDER MICHAEL MCGRATH ("Plaintiff" or "Battalion Commander McGrath"), through his attorneys, THE RANDO LAW FIRM P.C. and CULLEN AND DYKMAN LLP, hereby alleges, upon knowledge as to himself and his own actions and upon information and belief as to all other matters, as follows:

1.        Plaintiff is a citizen of the State of New York, residing in Queens, New York and is employed by The City of New York as a Fire Department of New York City  Battalion Commander.

2.        Upon information and belief, Defendant, MARILYN ARROYO, is an individual employed by The City of New York as a Fire Department of New York City Emergency Medical Services Paramedic ("Arroyo") and she is a resident of New York State in Queens County residing at 190-06B 69th Avenue, Flushing, New York  11365.

3.        Upon information and belief, Defendant, STEVEN RUSSO, is an individual employed by The City of New York as a Fire Department of New York City Emergency Medical Services Chief ("EMS Chief Russo" or "Russo") and he is a resident of Connecticut.

4.        Upon information and belief, Defendant, JAMES LEONARD, is an individual employed by The City of New York as the Fire Department of New York City Chief of the Department ("Department Chief Leonard" or "Leonard") and he is a resident of New York State in Richmond County residing at 285 Slater Boulevard, Staten Island, New York  10305.

5.        Upon information and belief, Defendant, DANIEL NIGRO, is an individual employed by The City of New York as the Fire Department of New York City Commissioner ("Commissioner Nigro" or "Nigro") and he is a resident of New York State in Queens County.

6.        Upon information and belief, defendant, MAYOR BILL DE BLASIO, is an individual employed by The City of New York as the Mayor ("Mayor De Blasio" or "De Blasio") and he is resident of New York State in Kings County.

7.        Upon information and belief, Defendant, THE FIRE DEPARTMENT OF THE CITY OF NEW YORK, is an organization performing firefighter and emergency services functions for The City of New York and is acting through its agents, employees,

directors/trustees, and/or officers/administrators, organized under the laws of New York State, receiving and operating with public funds ("FDNY"), and having its principal place of business at 9 Metrotech Center, Brooklyn, New York 11201.

8.      Upon information and belief, Defendant, THE CITY OF NEW YORK, is a municipality, acting through its agents, employees, directors/trustees, and/or officers/administrators, organized under the laws of New York State, receiving and operating with public funds ("NYC"), and having its principal place of business in New York City, NY.

9.      Defendant, NYC, has committed all acts alleged herein through its agents, employees, directors/trustees, and/or officers/administrators, and acting through its agents, employees, directors/trustees, and/or officers/administrators, was at all relevant times, Plaintiff's employer and was and is responsible for the official acts of Defendants, Arroyo, Russo, Leonard, Nigro and De Blasio.

10.      Defendant, FDNY, has committed all acts alleged herein through its agents, employees, directors/trustees, and/or officers/administrators, and acting through its agents, employees, directors/trustees, and/or officers/administrators, was at all relevant times, Plaintiff's employer and was and is responsible for the official acts of Defendants, Arroyo, Russo, Leonard and Nigro.

11.      Defendants, Arroyo, Russo, Leonard, Nigro and De Blasio, were at all relevant times, employed by defendant NYC, and each was an agent of NYC, and was and is responsible for the wrongful acts against Plaintiff.

12.      Defendants, Arroyo, Russo, Leonard and Nigro, were at all relevant times, employed by defendant FDNY, and each was an agent of FDNY, and was and is responsible for the wrongful acts against Plaintiff.

13.     Plaintiff sues each and every individual Defendant in both their individual and official capacities.

14.     Plaintiff has satisfied all prerequisites for filing this action.

## SUBJECT MATTER JURISDICTION

15.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 1343, 42 U.S.C. §§ 1981, 1981a, 1983, 1985, 1986, 2000e et seq., and this Court's Supplemental Jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

16.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391.

## GENERAL FACTUAL ALLEGATIONS-APPLICABLE TO ALL COUNTS

## NATURE OF CASE

17.     This is a civil action for declaratory and equitable relief, as well as for monetary damages, brought by Plaintiff seeking vindication for Defendants' blatant violations of his rights pursuant to: (i) the anti-discrimination provisions found in Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (ii) the anti-retaliation provisions found in Title VII; (iii); the Equal Protection Clause of the Fourteenth Amendment of the United States, to be enforced vis-à-vis Sections 1981, 1983, 1985 and 1986 of Title 42 of the United States Code ("Section 1983); (iv) the Freedom of Speech provision in the First Amendment of the United States Constitution, made applicable to the Defendants here vis-à-vis the Due Process Clause of the Fourteenth Amendment to the United States Constitution also to be enforced vis-à-vis Section 1983; (v) discrimination under N.Y.S. Executive Law Article 15 and N.Y.S. Civil Rights Law §§ 40-c & 40-d; (vi)  unlawful discriminatory practice under New York City Administrative Code Title 8 (§

8-502); (vii) tortious interference with contract; (viii) intentional infliction of emotional distress; (ix) breach of contract; and (x) any other claim(s) that can be inferred from the facts set forth herein.

18.     Specifically, Plaintiff, a FDNY Battalion Commander, brings this action to seek redress for the Defendants' egregious and relentless gender and racial discrimination in violation of Title VII in the form of a hostile work environment, and other adverse employment actions committed against him. The Defendants also retaliated against him for lodging good faith complaints of gender and racial discrimination by, *inter alia*, stripping Plaintiff of multiple positions which he held, failing to investigate his claims, and bringing false charges against him.

19.     Furthermore, the Defendants, while acting pursuant to a policy or custom under color of law and by way of authority and power granted to them by the laws of the State of New York, subjected or caused the Plaintiff to be subjected to the deprivation of rights, privileges and immunities secured by the First and Fourteenth Amendments to the Constitution of the United States and all the laws and statutes arising thereunder.

20.     Specifically, when Plaintiff learned that an EMS Paramedic and a Firefighter engaged in sex within the firehouse, he properly conducted an investigation.  In turn, not only did the FDNY choose not to investigate the actions of which Plaintiff made them aware, but he was summarily kicked out of his firehouse and brought up on outlandish and contrived charges because the FDNY chose to favor a Hispanic Female over a Caucasian (White) Male that has an outstanding and unblemished career and 38 years of heroic service to the City of New York.

21.     Additionally, the Defendants, while acting pursuant to a policy or custom under color of law and by way of authority and power granted to them by the laws of the State of New York, subjected or caused the Plaintiff to be subjected to the deprivation of rights, privileges and

immunities secured by the First and Fourteenth Amendments to the Constitution of the United States and all the laws and statutes arising thereunder.

22.    Specifically, after Plaintiff spoke as a citizen on a matter of public concern by bringing the Defendants' relentless policy of gender discrimination to the attention of the United States Equal Employment Opportunity Commission ("EEOC") and New York State Division of Human Rights ("SDHR") and the FDNY EEO, the Defendants retaliated against him.

23.    Lastly, while also acting pursuant to a policy or custom under color of law and by way of authority and power granted to them by the laws of the State of New York, the Defendants subjected Plaintiff to relentless gender and race discrimination depriving Plaintiff of the equal protection of the laws.

24.    Given the sheer volume of instances of gender and race discrimination and retaliation to which the Defendants subjected Plaintiff, as well as the fact that this harassment took place on a nearly daily basis during Plaintiff's employment with the Defendants, it is not possible to put exact dates to each and every occurrence. All of the instances detailed below took place within three years of the date of filing of this Complaint, and many of them took place within 300 days of Plaintiff having filed a Charge of Discrimination against the Defendants with the EEOC as described below. Where possible, Plaintiff provides specific dates for particular occurrences.

## PLAINTIFF'S UNBLEMISHED EMPLOYMENT HISTORY WITH THE FDNY

### *Promotions and Appointments*

25.    Battalion Commander McGrath was appointed to the FDNY on February 24, 1979 and was assigned to Engine 55 in New York City.

26.     Throughout his career, Battalion Commander McGrath routinely worked at the busiest firehouses throughout the City.

27.     In January, 1982, Battalion Commander McGrath transferred to Ladder 123.

28.     On June 6, 1988, Battalion Commander McGrath was promoted to the rank of Lieutenant and was assigned to Ladder 40 in Harlem.

29.     In July 1992, Battalion Commander McGrath worked during the chaotic Washington Heights riots and despite being attacked, he refused medical treatment because he did not want to leave his firefighters.

30.     On October 1, 1993, Battalion Commander McGrath was promoted to the rank of Captain and was assigned to Ladder 147 in Brooklyn.

31.     On September 10, 2000, Battalion Commander McGrath was promoted to the rank of Battalion Chief.

32.     For six months beginning in September, 2000, Battalion Commander McGrath worked in FDNY Headquarters.

33.     Despite being asked to become the Chief of Personnel, Battalion Commander McGrath did not *want a desk job*. *He wanted to save lives and fight fires*. He asked to be assigned to Rockaway so he could help the community in which he had lived for his entire life.

34.     After the horrific World Trade Center attack on 911, Battalion Commander McGrath worked at Ground Zero for six months leading rescue and recovery operations in addition to working his regular tours in his firehouse.

35.     The time spent at the site of the World Trade Center attacks has left Battalion Commander McGrath with lifelong health conditions, including having had multiple cancer treatments, for which he regularly sees doctors and takes medication.

36.     On November 12, 2001, Chief McGrath,  responded off duty to the devastating plane crash of Flight 587 in Rockaway.

37.     On April 1, 2003, Battalion Commander McGrath was promoted to the rank of Battalion Commander of Battalion 47 where he was in charge of all FDNY resources in the Rockaways.

38.     In 2005, Battalion Commander McGrath volunteered to go to New Orleans to assist in the aftermath of Hurricane Katrina where he spent weeks manning firehouses and supervising fire strike teams.

39.     In 2012, the Rockaways were hit very hard by Hurricane Sandy.  Battalion Commander McGrath and his team were uprooted, both personally in their own homes and professionally, due to the damage caused by the storm.  When they were able to go back, they were confronted by a fire that consumed 24 buildings.  Due to Chief McGrath's leadership, no other buildings caught fire even though his staff was greatly diminished due to the fallout from the storm.

40.     Battalion Chief McGrath is in the top 40 out of 11,000 in seniority of uniformed members in the FDNY.

***Honors, Awards and Recognition***

41.     Throughout his 38 year career with the FDNY, Battalion Commander McGrath has been honored and recognized for his for his multiple acts of outstanding service on numerous occasions.  Some examples of these honors and awards include:

a) Unit Citation in July, 1984 while working in Ladder 123;

b) Unit Citation in September, 1983 while working in Ladder 30;

c) Unit Citation in October, 2012 while working in Battalion 47;

   d)  Receiving all 3 Campaign Medals issued by the FDNY;

        i.   Campaign Medal issued for working at the World Trade Center site 2001,

       ii.   Campaign Medal issued for volunteering in New Orleans after Hurricane Katrina in 2005,

      iii.   Campaign Medal issued for working during and after Hurricane Sandy in 2012,

   e)  In August 2016, Chief McGrath, while off duty, rescued 4 people in a water rescue and received a Class A medal;

   f)  In June 2014, Battalion Commander McGrath received an award from the Northern Queens American Flag Association for his leadership during Hurricane Sandy and its aftermath;

   g)  In October 2016, Saint John's Hospital gave Battalion Commander McGrath an award for his leadership during Hurricane Sandy and its aftermath.

42.      Throughout his long career with the FDNY, Battalion Commander McGrath had never been reprimanded, written up, investigated, or counseled in any way and has always had stellar evaluations and reviews.

## THE UNIQUE SITUATION IN BATTALION 47

43.      In or about 2005, Battalion Commander McGrath was made aware that the FDNY intended to house Emergency Medical Services ("EMS") in the firehouse where he was Chief.

44.      There are only two firehouses in the FDNY which house EMS.

45.      At the time Battalion Commander McGrath learned of the plans for EMS, he questioned whether it was a good idea to house EMS within the firehouse. In fact, high ranking

Chiefs issued written reports indicating that the move of the firehouse would create problems in response time.

46.       There *were not and still are not* any written procedures for how situations within the firehouse that pertain to EMS workers should be handled.

47.       There were not and still are not any written procedures for how EMS workers and fire personnel should interact.

48.       *There was not and still is not* any written chain of command.

## **MARILYN ARROYO: "THE CALENDAR GIRL"**

49.       Marilyn Arroyo  has been at all relevant times an EMS Paramedic.

50.       Arroyo applied for and was chosen to be included and displayed in the 2017 Firefighter's Calendar. The Calendar Girl picture is attached hereto as **Exhibit I**.

51.       It is FDNY procedure that any time a FDNY vehicle is involved in a motor vehicle accident, the Battalion Chief must investigate the scene of the accident and write a report.

52.       In January, 2014, Battalion Commander McGrath received a notification that an EMS FDNY vehicle was involved in a motor vehicle accident.

53.       As per protocol, Battalion Commander McGrath visited the scene of the accident.

54.       One of the individuals involved in the accident was Arroyo.

55.       At the scene of the accident, Battalion Commander McGrath and Arroyo met for the first time.

56.       In the days following the accident, Battalion Commander McGrath saw Arroyo at the firehouse and asked her how long she had to stay at the scene of the accident. She responded

to him that she didn't have to stay long and the two went about their respective business for the day.

57.     Battalion Commander McGrath and Arroyo crossed paths a few times thereafter at the firehouse and exchanged pleasantries.

58.     For example, on one of those occasions, Arroyo told Battalion Commander McGrath that she had a son-in-law that was in the process of becoming employed by the FDNY.

59.     Shortly thereafter, Arroyo sent Battalion Commander McGrath a text message. Battalion Commander McGrath did not previously give Arroyo his cell phone number and he does not know how she obtained his personal contact information.

60.     Arroyo called Battalion Commander McGrath and asked him if he could give her any insight on the job for her son-in-law.

61.     They crossed paths on another occasion and met in Bayside after he visited his father in the nursing home where his father resided to discuss Arroyo's son-in-law's prospective job at the FDNY.

62.     They discussed their respective families and Arroyo indicated that she was going on a vacation with her boyfriend of four years and she hoped he would propose to her.

63.     Battalion Commander McGrath and Arroyo did not cross paths or communicate with each other for a few months after that night because Arroyo was rotated to another EMS station.

64.     In the Spring, 2014, Arroyo was assigned to Battalion 47 EMS station.

65.     Battalion Commander McGrath does not have supervisory authority over Arroyo. He does not, for example, have the ability to fire her, change her schedule, promote her, or determine her rate of pay.

66.      Upon seeing Battalion Commander McGrath for the first time in months, Arroyo advised Battalion Commander McGrath that her son-in-law was now employed by the FDNY and that she broke up with her boyfriend because he would not marry her.

67.      Battalion Commander McGrath routinely gets asked questions from EMS personnel and civilians concerning advice and procedures for getting into the FDNY.

68.      In July 2014, Arroyo again began texting Chief McGrath.  She asked him if a Firefighter exam was scheduled because now her sons were allegedly interested in becoming Firefighters.

69.      At this time, Battalion Commander McGrath **was not aware** that **Arroyo was caught having sex in the firehouse with a Firefighter.**

70.      Battalion Commander McGrath and Arroyo discussed her sons and son-in-law and the FDNY.

71.      In July 2014, Arroyo asked Battalion Commander McGrath to meet with her outside of work to discuss her children and their potential employment by the FDNY.

72.      In response to Arroyo's request, Battalion Commander McGrath advised Arroyo that he often invites his coworkers to his house for a barbeque during the summer and she was welcome to come to his house for a barbeque but it would have to be soon because he was scheduled to travel to England to introduce his girlfriend to his family.

73.      In fact, when Battalion Commander McGrath told his girlfriend that Arroyo would be going to his house to discuss her sons, his girlfriend stated that she thought it was nice that he was helping her.

74.      During the barbeque, Battalion Commander McGrath and Arroyo discussed their families and his planned vacation with his girlfriend.  Arroyo further told Battalion Commander

McGrath that she had five (5) children with two (2) different men; she was never married and had previously filed for bankruptcy.  Arroyo also stated that she worked overtime as much as possible and that Defendant, EMS Chief Russo constantly asked her to drive him during the midnight shifts on overtime, which she refused to do.

75.    After Battalion Commander McGrath returned from his vacation, Arroyo approached Battalion Commander McGrath and asked him about his trip. They discussed it while eating takeout food.  Arroyo informed Battalion Commander McGrath that her father had passed away and that she chose not to attend the funeral.

**BATTALION COMMANDER MCGRATH HEARS THAT ARROYO IS *HAVING SEX WITH A FIREFIGHTER IN THE FIREHOUSE***

76.    In or about January 2015, Battalion Commander McGrath began hearing numerous detailed accounts that Arroyo had sex with Firefighter Mike O'Neil in the firehouse either in the steam room or the gym during the early morning when there are typically few people around.

77.    Within a few weeks, Battalion Commander McGrath heard that Arroyo was "dating" a different Firefighter and was meeting him during the early hours in the Firehouse gym.   The "chatter" became rampant throughout the firehouse that she was now having sex with another Firefighter in the firehouse like she previously did with Firefighter O'Neil.

78.    In March 2015, Battalion Commander McGrath was having dinner one night in a local Rockaway restaurant and was approached by a woman who claimed her husband was a Firefighter.  She stated that she knew that Arroyo was having sex in the firehouse and that "everyone knew" it. Battalion Commander McGrath advised her to dial 311 if she had a complaint or to call him at the firehouse the next day.

79.     Now that he was presented with the information from various sources, inside and outside of the firehouse, Battalion Commander McGrath knew something needed to be done because such information, if true, would be "conduct detrimental to the Department" -- a violation of FDNY policies and procedures.

80.     People depend on the FDNY to save lives and to keep them from danger. Battalion Commander McGrath was concerned that such information, if made public, would have a deleterious impact on the FDNY and, in particular, Battalion 47.

81.     The day after Battalion Commander McGrath received the information from the woman that approached him at the restaurant, he met with Arroyo's supervisor, EMS Chief Russo on the apparatus floor of Engine 265.  Battalion Commander McGrath notified Russo that he was receiving  reports of  Arroyo  having sex in the firehouse and that he was not only receiving them around the firehouse but also that a civilian told him the same thing while he was out having dinner the previous night.

82.     Chief Russo advised Battalion Commander McGrath that he would look into it and get back to him before the end of that same day. That never happened.

83.     Tellingly, Battalion Commander McGrath never heard back from Chief Russo, despite his promise to get back to Chief McGrath.

84.     EMS Chief  Russo had previously made multiple comments indicating his envy of the Firefighters. For example, Chief Russo would regularly make comments about the Firefighters being "paid so much to sleep."   However, Battalion Commander McGrath never believed that would influence how Russo would handle complaints about the EMS personnel.

85.     Thereafter, Battalion Commander McGrath went into the kitchen and heard two Firefighters speaking about a fire that took place the day before where a person died.   The

Firefighters also said that Arroyo  kissed her Firefighter boyfriend on the lips at the scene of the fire where the civilian fatality had occurred.

86.    At this time, Battalion Commander McGrath knew he needed to take additional steps.

87.    Battalion Commander McGrath began to conduct an investigation.  Battalion Commander McGrath asked Arroyo  to speak with him.  They went into a room within the firehouse where he could discuss these sensitive matters in private with Arroyo and he advised her about what he heard.

88.    Arroyo  was unfazed and did not  act surprised to hear about the serious allegations of impropriety. She casually stated that it was not true. Battalion Commander McGrath was surprised and puzzled by Arroyo's  reaction  considering the potential negative consequences of the allegations and the gravity of the situation.

89.    Battalion Commander McGrath then asked her about whether she kissed a Firefighter on the lips at the scene of a fire where a person had died.  Such behavior is also improper and a violation of the proper decorum on the job.  She laughed it off and remarked that it was because  she had not seen him in a while.

90.    During the investigation conversation, Arroyo asked Battalion Chief McGrath for his advice once again.  This time, however, it was concerning her own career rather than the careers of her sons.  She advised him that she was interested in becoming a Rescue Paramedic and asked him what he thought.

91.    In order to become a Rescue Paramedic, Arroyo  would need to transfer to a different Battalion as Battalion 47 does not have Rescue Paramedics.  She said that she had interest in transferring to Battalion 54 where Rescue Paramedics are stationed.  Battalion

Commander McGrath told Arroyo that Rescue Paramedic is a promotion and it would be a good move for her. She then stated that the one downside to Battalion 54 was the lack of good food options. Battalion Commander McGrath told her that the FDNY would have to give her a meal. She then said that she was still only thinking about it and the conversation concluded.

92.    Firefighter O'Neil did not work in Chief McGrath's command and Battalion Commander McGrath was unable to question him with respect to the allegations of sex in the firehouse. As such,, and because Battalion Commander McGrath was concerned that Arroyo was now having sex within the firehouse with another Firefighter named Durkin, Battalion Commander McGrath contacted Assistant Chief, Edward Baggott ("Assistant Chief Baggott" or "Baggott") and Division Commander, James DiDomenico ("Division Commander DiDomenico" or "DiDomenico"), Battalion Commander McGrath felt it necessary to contact Baggott and DiDomenico as he was not sure how to proceed since there were (*and still are*) no procedures in place for investigating EMS misconduct within the firehouse.

93.    Battalion Commander McGrath's concerns were later confirmed as reality.

94.    Upon information and belief, Chief Baggott contacted the Bureau of Investigations and Trials (BITs) to inquire as to how to proceed.

95.    Later that day, Division Commander DiDomenico called Battalion Commander McGrath and advised him that BITs was not going to investigate the improper and inappropriate behavior, however, the BITs Commissioner informed Division Commander DiDomenico that Arroyo and Firefighter Durkin needed a conference to discuss inappropriate behavior. It was decided that Arroyo's EMS supervisors would talk to Arroyo and that Division Commander DiDomenico would speak with Firefighter Durkin.

96.     Upon information and belief, BITs chose not to act on the allegations of improper behavior by Arroyo  because she is Hispanic and a female.

97.     Thereafter, Division Commander DiDomenico instructed all Battalion Commanders to give drills on inappropriate behavior.  Battalion Commander McGrath instructed the Chiefs in Battalion 47 to give the appropriate drills which they did.

98.     Throughout the drills, various Firefighters referenced and made repeated comments about the incidents involving Arroyo  and Firefighters, O'Neil and Durkin.   Battalion Commander McGrath told the Firefighters to stop speaking about the inappropriate sexual activities being engaged in within the firehouse.

99.     Battalion Commander McGrath subsequently heard that everyone attending the drills in the various locations was talking about the incidents concerning Arroyo  and Firefighter O'Neil.

### BATTALION COMMANDER MCGRATH WAS NOTIFIED THAT A CIVILIAN DIED AT THE HANDS OF MARILYN ARROYO

100.     In or about March 2015, Battalion Commander McGrath was approached by Captain Joe Cavanagh concerning Arroyo. Captain Cavanagh advised Battalion Commander McGrath that there had been a problem on an EMS call where his Engine was giving CPR when Arroyo  and her partner arrived.  As per protocol, the Paramedics took over and Arroyo's partner was inserting a tube into the person's airway.  At that time, Arroyo  should have been assisting in the CPR but she just stood by.   Her supervisor saw that she was not doing her job, pushed her out of the way and did her job for her.   However, it was too late and the individual died. Battalion Commander McGrath advised Captain Cavanagh that he would bring it to the attention of EMS Chief  Russo.

101.    Immediately thereafter, Battalion Commander McGrath approached EMS Chief Russo and Captain Joe Gasparino and began to advise them that an individual died at the hands of Arroyo.  EMS Chief  Russo cut Battalion Commander McGrath off and stated "her partner carries her."  He further stated that he "couldn't believe she stayed in Battalion 47 with everyone talking about her."   Battalion Commander McGrath advised Chief Russo and Captain Gasparino that Arroyo indicated that she was seeking a promotion to Rescue Paramedic but was worried about getting meals in Battalion 54.  Captain Gasparino stated: "I am the one who has to recommend her for that and I would never recommend someone who had something like that hanging over their head." Captain Gasparino then stated: "she has ruined her career."

102.    Russo and Captain Gasparino then related additional stories about other inappropriate behavior by Arroyo, however, during their discourse, Battalion Commander McGrath received a fire call and left to respond to the call while they were talking.  He never received any further contact from them concerning the situation.

**BATTALION COMMANDER MCGRATH
IS BANISHED TO QUEENS BOROUGH COMMAND**

103.    On or about March 27, 2015, Battalion Commander McGrath was, suddenly and without warning, removed from his firehouse, sent to Queens Borough Command and stripped of his duties.

104.    Battalion Commander McGrath was not advised as to why he was being moved or for how long he would be at Queens Borough Command.

105.    Battalion Commander McGrath was no longer involved with fighting fires, supervising Firefighters, as he had over the course of his illustrious career nor doing any of the

daily activities on the job that he had enjoyed doing for the previous 15 years.  In fact, Battalion Commander McGrath was now relegated to sitting at a desk every day and creating a newsletter once a month.

106.    Upon information and belief, these actions were taken against Battalion Commander McGrath because he is a Caucasian (white) and a male who investigated allegations of wrongdoing against Arroyo who is Hispanic and a female.

107.    Upon information and belief, the FDNY chose to investigate Battalion Commander McGrath because he is a white male and chose to ignore the violations, improprieties and inappropriate conduct of Arroyo because she is  Hispanic and a Female.

## A WITNESS TO THE SEXUAL ACTS
## BETWEEN ARROYO AND FIREFIGHTER O'NEIL
## COMES FORWARD: "THE LOAD ON THE FLOOR"

108.    On or about April 1, 2015, Battalion Commander McGrath and Chief Gary Rocco had a discussion wherein Battalion Commander McGrath advised Chief Rocco that he was stripped of his duties and taken out of his firehouse.  When Chief Rocco asked why, Battalion Commander McGrath stated that Arroyo allegedly filed a complaint with the FDNY EEO.  Chief Rocco advised Battalion Commander McGrath that months earlier, Firefighter Gary O'Hal advised Chief Rocco he witnessed Arroyo and Firefighter O'Neil on July 4, 2014 having sex in the steam room located in the men's bathroom of the firehouse.

109.    After the phone call with Chief Rocco, Battalion Commander McGrath called Firefighter O'Hal to ask him about what Chief Rocco had told him.  Firefighter O'Hal stated it was true and then proceeded to tell Battalion Commander McGrath what he witnessed.

110.    Firefighter O'Hal specifically reported that he went to use the gym at the firehouse and when he reached the stairs, he saw Arroyo and Firefighter O'Neil pressed up against each other kissing.  He said that when they saw him, they immediately moved away from each other and he continued to the locker room to get changed for his workout.  He then reported that while he was working out he took a break to go turn on the steam room so it would be ready when he was finished with his workout.  When he got into the men's bathroom where the steam room was located, he saw Firefighter O'Neil and Arroyo having sex.  Specifically, he reported that Arroyo was bent over and Firefighter O'Neil was having sex with her from behind.  He further stated that he was so disgusted, he left the bathroom.  When he returned later, he stated that he was sickened by the incident and had "found a ***load of semen*** on the floor" of the steam room.

111.    Firefighter O'Hal stated that he confronted Firefighter O'Neil in front of other Firefighters about what he saw later that day and Firefighter O'Neil proudly laughed uncontrollably.  Specifically, Firefighter O'Hal recounted to Battalion Commander McGrath the following conversation that took place between O'Hal and O'Neil:

| | |
|---|---|
| **O'Hal:** | **"I saw what you did"** |
| **O'Neil:** | **"What" (while smirking)** |
| **O'Hal:** | **"You were f—king that girl Marilyn in the steam room"** |
| **O'Neil:** | **Proudly laughs** |
| **O'Hal:** | **"you are a nasty m-therf--ker, you left a load on the floor"** |
| **O'Neil:** | **continues to laugh harder** |

112.    Battalion Commander McGrath was in disbelief and asked Firefighter O'Hal if he was absolutely sure because the behavior, if accurate, is a serious violation of policy for which people had previously been fired.

113.    Firefighter O'Hal said he was sure and said he was very embarrassed when he saw what he saw.

114.     Still in shock, Battalion Commander McGrath once again asked if he was sure. Firefighter O'Hal, apparently became slightly agitated and said "Chief, I am sure, I don't know if he was f—king her in the ass or in the p-ssy, but he was definitely f—king her."

115.     Firefighter O'Hal further told Battalion Commander McGrath that O'Neil never brought the incident up to O'Hal again despite working together in the same firehouse on a daily basis.

116.     In fact, O'Neil not only  did not deny the lascivious conduct to O'Hal contemporaneously when O'Hal confronted him shortly after the sordid incident, O'Neil did not deny it at any time thereafter

117.     Upon information and belief, Arroyo was well aware of the fact that she was caught engaging in sexual acts in the steam room located in the men's room at the firehouse.

118.     Upon information and belief, Arroyo was also aware and concerned that Battalion Commander McGrath would find out that she engaged in sexual acts in the steam room located in the men's room at the firehouse.

119.     Upon information and belief, Arroyo began a "friendship" with Battalion Commander McGrath to gauge whether he was aware that she engaged in sex in the firehouse.

120.     When Arroyo was finally questioned about the sexual acts performed in the firehouse, a violation on the job for which she could be fired, she decided to "protect herself" and file a claim of harassment against Chief McGrath.

121.     The FDNY chose to protect Arroyo because she is a Hispanic Female and they chose to attack, harass, and treat differently, Battalion Commander McGrath because he is a Caucasian/White male.

122.    Upon information and belief, two Firefighters were not enough for Arroyo.  She has continued to climb the rungs of the FDNY ladder to greater heights and is now "dating" a Firefighter that offers her rock solid job security --- Commissioner Nigro's nephew, Lieutenant Adam Vilagos.

## FDNY COMPLETELY IGNORES AND VIOLATES ITS OWN
## EEO POLICIES WITH REGARD TO CHIEF MCGRATH

123.    Prior to being removed from his firehouse and stripped of his duties, Battalion Commander McGrath was telephoned by EEO Head Investigator and he was told  that Arroyo filed a complaint against him and that he should not retaliate against her.  Battalion Commander McGrath replied that he would not. Although he worked in the same firehouse as Arroyo,  he had no authority over Arroyo.

124.    Shortly thereafter, within days of the phone call and without warning, Battalion Commander McGrath was summarily removed from his firehouse and stripped of his duties.

125.    At some point after being removed from his firehouse, someone at the Uniformed Fire Officers Association ("UFOA") advised Battalion Commander McGrath that they heard Arroyo filed a claim of harassment.  He was not given any additional information.

126.    It was not until November 24, 2015, eight (8) months after being yanked from his firehouse, that Battalion Commander McGrath received a "Notice of Investigation" whereby he was advised in a single sentence that there was an allegation against him by a "female subordinate.

127.    Arroyo is not and was not at any time a subordinate of Chief McGrath.

128.    In addition to being advised of the allegation, Battalion Commander McGrath was advised to call the FDNY EEO office within three (3) business days to schedule an interview.

129.    Battalion Commander McGrath was not notified in writing by the FDNY who made the allegation against him.

130.    Battalion Commander McGrath was not given the opportunity to respond to the allegation against him as required in the FDNY EEO Policy Section III(B).

131.    Throughout the entire eight (8) months that Battalion Commander McGrath was banished to Queens Borough Command, Arroyo continued to enjoy working at Battalion 47 without any investigation into any of her violations on the job: (1) engaging in sex acts in the firehouse;(2) her kissing another Firefighter at the scene of a fire where a civilian died; (3) or, her inability to perform her actual job duties costing a civilian to lose his life.

132.    The purported "interview" that the FDNY EEO requested was conducted on January 6, 2016 which was approximately nine (9) months after being yanked from his firehouse without an explanation.

133.    After the January 6, 2016 interview, Battalion Commander McGrath was again kept in the dark for months.

134.    It was not until Battalion Commander McGrath filed a complaint with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission, as well as an internal FDNY EEO complaint, that the FDNY again conveniently began to "investigate" the claims against Battalion Commander McGrath (the "Biased Investigation").

135.    The long-drawn out process employed by the FDNY was in direct contradiction to the City of New York EEO Complaint guidelines where it is specifically stated that all investigations must be completed within 90 calendar days.

136.    Defendants, NYC and FDNY have, and continue to violate the NYC and FDNY proper procedures, rules, regulations and codes in its dealings with, and mistreatment of, Battalion Commander McGrath.

## FDNY RETALIATED AGAINST BATTALION COMMANDER MCGRATH FOR FILING A COMPLAINT WITH THE NEW YORK STATE DIVISION OF HUMAN RIGHTS

137.    On May 16, 2016, Battalion Commander McGrath filed a complaint with the New York State Division of Human Rights ("SDHR") and simultaneously with the United States Equal Employment Opportunity Commission ("EEOC").

138.    Also on May 16, 2016, Battalion Commander McGrath filed a complaint with the FDNY EEO office complaining of discrimination and harassment based on race and gender.

139.    Battalion Commander McGrath was told that, because he filed a complaint with the SDHR, the FDNY EEO would not investigate his claims.

140.    Battalion Commander McGrath was once again shocked that the FDNY was not interested in investigating his claims of discrimination in the workplace just because he went to an outside agency.

141.    Upon information and belief, the FDNY chose to ignore Battalion Chief McGrath's complaints of discrimination and harassment because he is a Caucasian/White Male.

142.    Battalion Commander McGrath was shocked that within weeks of his filing a complaint with the EEO office and the SDHR, the FDNY suddenly decided to re-open the Biased Investigation into the claims made against him by Arroyo when they had been sitting dormant for another five (5) months or one (1) year and two (2) months after the Arroyo allegations[1].

---

[1] The Arroyo charge against Chief McGrath was allegedly filed in March 2015. Chief McGrath did not learn of the allegations against him until receiving a request for an interview dated November 24, 2015 (eight months later).

143.      On June 9, 2016 (three (3) weeks and three (3) days after filing his SDHR Complaint), FDNY EEO informed Battalion Commander McGrath that they needed to interview him in order to conclude the Biased Investigation against him.

144.      Due to scheduling conflicts, the interview took place on July 7, 2016 wherein the FDNY EEO placed Battalion Commander McGrath under oath in contradiction to and violation of the written policies and procedures of the FDNY

145.      Upon information and belief, placing someone under oath during an FDNY EEO interview has never before been done.

146.      Upon information and belief, Battalion Commander McGrath was placed under oath as an additional form of harassment, discrimination and retaliation, and to intimidate Battalion Commander McGrath.

147.      On August 15, 2016, Battalion Commander McGrath received written notification from FDNY EEO that the allegations against him were substantiated and that the matter would be referred to BITs for discipline against Chief McGrath.

148.      On September 9, 2016, Battalion Commander McGrath was served with trumped up charges for which there was no basis.

149.      Upon information and belief, in further retaliation against Battalion Commander McGrath for filing a protected complaint with the SDHR and the EEOC the FDNY violated their policies by improperly placing Battalion Commander McGrath under oath.

150.      Battalion Commander McGrath filed a grievance with the FDNY due to the flagrant disregard of policy by the FDNY EEO office.

_____

The interview was held on January 6, 2016 (10 months after the Arroyo charge). No further action was taken by the FDNY EEO until immediately after Chief McGrath filed a complaint with the SDHR on May 16, 2016 (one year and two months after the Arroyo charge).

## BATTALION COMMANDER MCGRATH
## RECEIVES THREATS AND INTIMIDATION FROM THE FDNY

151.    In August 2015, Battalion Commander McGrath learned some information about the allegations against him when he was approached by the UFOA and told that the investigation by the FDNY EEO would cease and he would not be allowed to go back to work at his firehouse if he admitted to blatantly false information.

152.    Specifically, he was told he had to admit to:  (1) "dating" Arroyo; (2) firefighters talking about Arroyo having sex in the firehouse; and, (3) going over to Firefighter Durkin's home and telling  him to "break up with" Arroyo.

153.    Battalion Commander McGrath repeatedly refused to admit to the outlandish fabrications contained in items numbered (1) & (3) of the immediately preceding paragraph herein ("the fabrications").

154.    Within a few days of this initial threat, Battalion Commander McGrath was approached by Assistant Chief Edward Baggott.  Assistant Chief Edward Baggott is the fifth highest uniformed officer of the FDNY and is on the Staff of the Chief of the Department, James Leonard.  Assistant Chief Baggott told Battalion Commander McGrath that someone in Headquarters told him to tell Battalion Commander McGrath to take the deal being offered.

155.    Battalion Commander McGrath told Assistant Chief Baggott that he could not sign the deal because it contained information that was untrue, namely the fabrications as alleged herein.

156.    Assistant Chief Baggott advised Battalion Commander McGrath that he was only the messenger.  Battalion Commander McGrath felt threatened and that he was being intimidated by the FDNY.

157.    Upon information and belief, Assistant Chief Baggot speaks on behalf of Department Chief Leonard.

158.    The threats did not stop there.  Battalion Commander McGrath was called by Richie Alles of the union and told that someone in leadership from FDNY told him that Battalion Commander McGrath should take the "deal" and if he did not, the FDNY would "*go after*" Chief McGrath.

159.    Upon information and belief, Richie Alles is being investigated for fraud on the Department.

160.    Upon information and belief, the individual sending the threats through various intermediaries was the Chief of the Department, James Leonard.

## FURTHER ACTS OF RETALIATION

161.    On August 13, 2016, Battalion Commander McGrath rescued 4 individuals from a riptide situation while he was off-duty.  For his acts of heroism, Battalion Commander McGrath was recommended to the Board of Merit for a Class 3 award by Chief DiDomenico.

162.    A Class 3 award would result in Battalion Commander McGrath being honored on Medal Day in June 2017.

163.    Upon information and belief, in 17 years of recommending medals, all of Chief DiDomenico's recommendations have always been granted as requested.

164.    On January 19, 2017, Battalion Commander McGrath was advised that he received a Class A award rather than the more prestigious Class 3 award.  A Class 3 award would require the FDNY to honor Battalion Commander McGrath on Medal Day.

165.    Upon information and belief, the reason Battalion Commander McGrath was given a Class A award, rather than the more prestigious Class 3 award, was in retaliation for filing a protected complaint with the SDHR and EEOC.

## COUNT I - 42 USC § 1981

166.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

167.    Defendants committed the acts alleged in the immediately preceding paragraph above, inclusive, with racial and/or color-based animus depriving plaintiff, on the basis of his race and/or color, of the full and equal enjoyment and benefit of the law, and privileges and advantages thereunder, including the right to make and enforce contracts and to have an interest in protection of his property interests free from violation of his constitutional and statutory rights as secured and set forth in the Fourteenth Amendment of the United States Constitution and the provisions of 42 U.S.C. § 1981.

168.    Upon information and belief, Defendants, NYC, FDNY, De Blasio and Nigro were and are aware of, condone, and permit without reprisal or reprimand, various improper acts, including, without limitation, the discriminatory conduct and violations of FDNY rules, codes and regulations, as alleged in the general allegations contained herein, committed by Defendants, Leonard, Russo, Arroyo and other FDNY personnel against Plaintiff, on the basis of his race and/or color.

169.    Defendants committed the acts alleged in the preceding three paragraphs above, inclusive, with racial animus depriving plaintiff, on the basis of his race and/or color, of the full and equal enjoyment and benefit of the law, and privileges and advantages thereunder, including the right to make and enforce contracts and to have an interest in protection of his property

interests free from violation of his constitutional and statutory rights as secured and set forth in the Fourteenth Amendment of the United States Constitution and the provisions of 42 U.S.C. § 1981.

170.    Defendants' disparate treatment of plaintiff on the basis of race and/or color, was a willful and intentional violation of plaintiff's equal protection and due process rights guaranteed under the United States Constitution and within the contemplation of 42 U.S.C. § 1981.

171.    Defendants' disparate treatment of plaintiff on the basis of race and/or color, caused plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, plaintiff requests judgment on Count I of this lawsuit against Defendants, NYC, FDNY, De Blasio,  Nigro, Leonard, Russo, and Arroyo,  jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT II - 42 USC § 1983

172.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

173.     Defendants, Arroyo, Russo and Leonard, acting under color of state law, singled out and targeted Plaintiff with gender, racial and/or color-based discrimination, and retaliation in violation of his Civil Rights.

174.     Upon information and belief, Defendants, NYC, FDNY, De Blasio and Nigro, were and are aware of the various improper acts, including, without limitation, the discriminatory conduct and violations of FDNY rules, codes and regulations, as alleged in the general allegations contained herein, by Defendants, Arroyo, Russo, Leonard and other FDNY personnel against Plaintiff, on the basis of his gender, race and/or color.

175.     Upon information and belief, Defendants, NYC's, FDNY's, De Blasio's and Nigro's, failure to swiftly and adequately reprimand  Defendants, Arroyo, Russo and Leonard, and/or prevent or terminate their violations of his Civil Rights is a condonation, ratification, approval and perpetuation of these activities and is a violation of his constitutionally protected rights.

176.     Defendants, Arroyo, Russo and Leonard, acting under color of state law, sought to and did deprive Plaintiff, on the basis of his gender, race and/or color, of his right to make and enforce contracts, by employing coercive, harassing and intimidating tactics aimed at inducing Defendants, NYC, FDNY, De Blasio and Nigro to discontinue, or effectively terminate Plaintiff's employment functions at the FDNY.

177.     Defendants, NYC, FDNY, De Blasio, Nigro, Leonard, Russo, and Arroyo, committed the acts alleged in the preceding six paragraphs above, inclusive, with gender, racial and/or color-based animus depriving Plaintiff, on the basis of his gender, race and/or color, of the full and equal enjoyment and benefit of the law, and privileges and advantages thereunder, as are enjoyed by female citizens and/or non-white citizens, including the right to make and enforce

contracts and to have an interest in protection of his property interests free from violation of his constitutional and statutory rights as secured and set forth in the Fourteenth Amendment of the United States Constitution and the provisions of 42 U.S.C. § 1983.

178.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, Russo's and Arroyo's conduct, as alleged in the preceding seven paragraphs above, inclusive, were willful and intentional violations of Plaintiff's equal protection and due process rights guaranteed under the United States Constitution and within the contemplation of 42 U.S.C. § 1983.

179.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's and Leonard's conduct, as alleged in the preceding eight paragraphs above, inclusive, is due to a pattern and an unequivocal policy or custom implemented by the Defendants at the highest level of NYC and the FDNY.

180.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, Russo's, and Arroyo's conduct, as alleged in preceding nine paragraphs above, inclusive, caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a  viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, Plaintiff requests judgment on Count II of this lawsuit against, Defendants, NYC, FDNY, De Blasio,  Nigro, Leonard, Russo, and Arroyo,  jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT III - 42 USC § 1985

181.   Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

182.   Defendants, Arroyo and Russo, singled out and targeted Plaintiff with false and disparaging accusations of that they communicated to Defendants, NYC, FDNY, De Blasio and Nigro.

183.   Defendants, Arroyo and Russo, conspired to and did deprive Plaintiff of his right to make and enforce contracts, by employing coercive and intimidating tactics aimed at interfering with Plaintiff's employment contract with Defendants, NYC, FDNY, De Blasio and Nigro, and inducing Defendants, NYC, FDNY, De Blasio and Nigro, to discontinue, or effectively terminate, Plainitiff's employment functions at the FDNY and it was discontinued and effectively terminated.

184.   Defendants, Arroyo and Russo, committed the acts alleged in the preceding three paragraphs numbered above, inclusive, with racial animus depriving Plaintiff, on the basis of his race and/or color, of the full and equal enjoyment and benefit of the law, and privileges and advantages thereunder, as are enjoyed by non-white citizens, including the right to make and enforce contracts and to have an interest in protection of his property interests free from violation of his constitutional and statutory rights as secured and set forth in the Fourteenth Amendment of the United States Constitution and the provisions of 42 U.S.C. § 1985.

185.   In doing the acts and things above complained of, Defendants, Arroyo and Russo, were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive plaintiff of rights guaranteed to him under the Constitution and laws of the United States, as hereinabove enumerated.

186.    Defendants', Arroyo's and Russo's, conduct, as alleged in the preceding five paragraphs above, inclusive, caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, plaintiff requests judgment on Count III of this lawsuit against Defendants, Arroyo and Russo, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

### COUNT IV - 42 USC § 1986

187.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

188.    Upon information and belief, Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, were and are aware of the acts committed by Arroyo and Russo as alleged in Count III above.

189.    Upon information and belief, Defendants, NYC's, FDNY's, De Blasio's, Nigro's and Leonard's  failure to swiftly and adequately reprimand  Defendants, Arroyo, Russo, and/or prevent or terminate their violations of his Civil Rights is a condonation, ratification, approval and perpetuation of these activities and is a violation of his constitutionally protected rights.

190.    Upon information and belief, Defendants, NYC, FDNY, De Blasio and Nigro, were and are aware of the various improper acts, including, without limitation, the discriminatory

conduct and violations of FDNY rules, codes and regulations, as alleged in the general allegations contained herein, by Defendants, Arroyo, Russo, Leonard and other FDNY personnel against Plaintiff. on the basis of his gender, race and/or color.

191.    Upon information and belief, Defendants, NYC's, FDNY's, De Blasio's and Nigro's, failure to swiftly and adequately reprimand  Defendants, Arroyo, Russo and Leonard, and/or prevent or terminate their violations of his Civil Rights is a condonation, ratification, approval and perpetuation of these activities and is a violation of his constitutionally protected rights.

192.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, conduct, as alleged in preceding five paragraphs above, inclusive, caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a  viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, Plaintiff requests judgment on Count IV of this lawsuit against, Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT V – TITLE VII EMPLOYMENT DISCRIMINATION
## (TERMINATION OF EMPLOYMENT FUNCTIONS)

193.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

194.    Plaintiff filed a verified charge of discrimination on the basis of gender, race and color, under Title VII of the Civil Rights Act of 1964, as amended (hereinafter "Title VII"), with the United States Equal Employment Opportunity Commission (hereinafter the "EEOC") on May 16, 2016, in connection with his employment with Defendants, NYC, FDNY, De Blasio and Nigro.

195.    The EEOC issued a "NOTICE OF RIGHT TO SUE" to Plaintiff that was received by Plaintiff after December 19, 2016 and on or about December 22, 2016.

196.    All conditions precedent to the institution of this lawsuit have been fulfilled.

197.    At all relevant times, Defendants, NYC and FDNY employed in excess of 500 employees, was and is engaged in an industry affecting commerce, was and is an employer as defined by 42 U.S.C. § 2000e.

198.    At all relevant times, Defendant, De Blasio, was and is an agent of an employer within the meaning of 42 U.S.C. § 2000e.

199.    At all relevant times, Defendant, Nigro, was and is an agent of an employer within the meaning of 42 U.S.C. § 2000e.

200.    At all relevant times, Defendant, Leonard, was and is an agent of an employer within the meaning of 42 U.S.C. § 2000e.

201.    Plaintiff's employment functions at the FDNY were discontinued, or effectively terminated, by defendants because of his gender, race and/or color. This action violated 42 U.S.C. § 2000e et seq.

202.    The effect of the practices complained of above has been to deprive Plaintiff, of equal employment opportunities.

203.    Defendant's', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, discontinuance, or effective termination of Plaintiff's employment functions, was a willful and intentional violation of Title VII, within the contemplation of 42 U.S.C. § 2000e et seq.

204.    Defendants', NYC's,  De Blasio's, FDNY's, Nigro's and Leonard's , discontinuance, or effective termination of Plaintiff's employment functions, caused plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with NYC and  FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within  the contemplation, of 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

WHEREFORE, Plaintiff requests judgment on Count V of this lawsuit against Defendants, NYC,  FDNY,  De Blasio, Nigro and Leonard, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT VI – TITLE VII EMPLOYMENT DISCRIMINATION
## (HOSTILE WORK ENVIRONMENT)

205.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

206.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, Russo's, and Arroyo's, conduct as alleged herein created a gender-based, racially and color-based hostile work environment. Defendants, NYC's, FDNY's, De Blasio's, Nigro's and Leonard's failure to take effective steps to stop this inappropriate behavior is a condonation, ratification, approval and perpetuation of the gender-based and racially and color-based hostile work environment at FDNY.

207.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities by forcing Plaintiff to endure gender-based, racial and color-based harassment.

208.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, Russo's, and Arroyo's, gender-based, racial and color-based harassment of plaintiff was a willful and intentional violation of Title VII, within the contemplation of 42 U.S.C. § 2000e et seq.

209.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, Russo's, and Arroyo's, gender-based, racial and color-based harassment of plaintiff, caused plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within the contemplation, of 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

WHEREFORE, Plaintiff requests judgment on Count VI of this lawsuit against Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be

determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

**COUNT VII – TITLE VII EMPLOYMENT DISCRIMINATION (RETALIATION)**

210.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

211.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's, Leonard's, conduct, subsequent to Plaintiff's complaints of discrimination and harassment, as alleged herein, constitutes separate acts of discriminatory retaliation against Plaintiff.

212.    The effect of the practices complained of above has been to deprive Plaintiff, of equal employment opportunities by forcing Plaintiff to suffer retaliation for complaining about violations of his civil rights.

213.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, acts of discriminatory retaliation against Plaintiff were willful and intentional acts in violation of Title VII, within the contemplation of 42 U.S.C. § 2000e et seq.

214.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, discriminatory retaliation against Plaintiff, caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within  the contemplation, of 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

WHEREFORE, Plaintiff requests judgment on Count VII of this lawsuit against Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT VIII - DISCRIMINATION UNDER N.Y.S. EXECUTIVE LAW ARTICLE 15 AND N.Y.S. CIVIL RIGHTS LAW §§ 40-c & 40-d

215.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

216.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's acts, as alleged in immediately preceding paragraph above, were willful and intentional violations of Plaintiff's equal protection and due process rights guaranteed under the New York State Constitution.

217.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's acts, as alleged in the two preceding paragraphs above, inclusive, were unlawful discriminatory practices under New York State's Executive Law, Exec.L. § 296.

218.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's acts, as alleged in the first two paragraphs of Count VIII, subjected Plaintiff to discrimination in his civil rights in violation of New York State's Civil Rights Law, Civ. R.L. § 40-c.

219.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, gender-based, racial and color-based harassment, discontinuance and effective termination of Plaintiff's

employment functions, and discriminatory retaliation  caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within the contemplation, of N.Y.S. Exec.L. § 296, and N.Y.S. Civ. R.L. §§ 40-c & 40-d.

220.    Defendants', De Blasio's, Nigro's, Leonard's, Arroyo's and Russo's acts, as alleged in in the first paragraph of Count VIII, were willful and intentional violations of Plaintiff's equal protection and due process rights guaranteed under the New York State Constitution.

221.    Defendant's, Defendants', De Blasio's, Nigro's, Leonard's, Arroyo's and Russo's acts, as alleged in in the first paragraph of Count VIII were unlawful discriminatory practices under New York State's Executive Law, Exec.L. § 296, and also aided, abetted, incited, compelled and/or coerced performance of forbidden acts under New York State's Executive Law, Exec.L. § 296.

222.    Defendant's, Defendants', De Blasio's, Nigro's, Leonard's, Arroyo's and Russo's acts, as alleged in in the first paragraph of Count VIII, subjected plaintiff to discrimination in his civil rights in violation of New York State's Civil Rights Law, Civ. R.L. § 40-c, and also aided and/or incited violation of New York State's Civil Rights Law, Civ. R.L. § 40-c, in violation of New York State's Civil Rights Law, Civ. R.L. § 40-d.

223.    Defendant's, Defendants', De Blasio's, Nigro's, Leonard's, Arroyo's and Russo's acts, as alleged in in the first paragraph of Count VIII caused plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a viable career with FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future

pecuniary losses, professional embarrassment and public humiliation in violation, and within the contemplation, of N.Y.S. Exec.L. § 296, and N.Y.S. Civ. R.L. §§ 40-c & 40-d.

224.    Notice of commencement of so much of this action as falls under N.Y.S. Civ. R.L. §§ 40-c & 40-d has been served upon the New York State Attorney General, at or before the commencement of said action, in compliance with the requirements of N.Y.S. Civ. R.L. §§ 40-c & 40-d.

WHEREFORE, Plaintiff requests judgment on Count VIII of this lawsuit against Defendants, NYC, FDNY, De Blasio, Nigro, Leonard, Arroyo and Russo jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, statutory penalties, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT IX - UNLAWFUL DISCRIMINATORY PRACTICE
## UNDER NEW YORK CITY ADMINISTRATIVE CODE TITLE 8 (§ 8-502)

225.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

226.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's acts, as alleged in the first paragraph of Count IX, subjected plaintiff to gender-based, racial and color-based harassment, discrimination and discriminatory retaliation. This action violated N.Y.C. Admin. Code Title 8 et seq.

227.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's failure to take effective steps to terminate the inappropriate behavior, as alleged herein, is a condonation,

ratification, approval and perpetuation of gender-based, racial and color-based harassment, discrimination and discriminatory retaliation Plaintiff was forced to endure at the FDNY.

228.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities, equal protection and due process by forcing Plaintiff to endure gender-based, racial, and color-based harassment, discrimination and discriminatory retaliation.

229.    Defendants', NYC's, FDNY's, De Blasio's, Nigro's and Leonard's gender-based, racial, and color-based harassment, discrimination and discriminatory retaliation of Plaintiff were willful and intentional violations, and within the contemplation, of N.Y.C. Admin. Code Title 8 et seq.

230.    Defendants' NYC's, FDNY's, De Blasio's, Nigro's and Leonard's gender-based, racial, and color-based harassment, discrimination and discriminatory retaliation of Plaintiff, caused Plaintiff to suffer irreparable harm to his ability to pursue his career with the FDNY, severe mental anguish, personal  pain and suffering, loss of enjoyment of life, loss of a  viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within the contemplation, of N.Y.C. Admin. Code Title 8 et seq.

231.    Defendants', Arroyo's and Russo's acts, as alleged in the first paragraph of Count IX, were unlawful discriminatory practices under N.Y.C. Admin. Code Title 8 et seq., that aided, abetted, incited, compelled and/or coerced performance of forbidden acts under N.Y.C. Admin. Code Title 8 et seq.

232.    Defendants', Arroyo's and Russo's acts, as alleged in the first paragraph of Count IX, caused plaintiff to suffer irreparable harm to his ability to pursue his career with the FDNY, severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a  viable

career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation in violation, and within the contemplation, of N.Y.C. Admin. Code 8 et seq.

233.    Copies of this complaint have been served upon the City Commission on Human Rights and the Corporation Counsel, prior to commencement of this civil suit, in compliance with the requirements of N.Y.C. Admin. Code § 8-502(c).

WHEREFORE, Plaintiff requests judgment on Count IX of this lawsuit against Defendants, NYC, FDNY, De Blasio, Nigro, Leonard, Arroyo and Russo, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, statutory penalties, expungement of all improper adverse references from plaintiff's records and such other and further relief as this Court may deem just and proper.

## COUNT X – VIOLATION OF FIRST AMENDMENT FREE SPEECH AND CIVIL RIGHTS (U.S. CONST. AMENDMENTS I & XIV, 42 U.S.C. 1983)

234.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

235.    The aforementioned adverse employment actions, hostile work environment and other acts of retaliation described above are a violation of Plaintiffs' Freedom of Speech rights protected under the First Amendment via the Fourteenth Amendment and 42 U.S.C. § 1983.

236.    As fully described above, Plaintiff engaged in activity protected under the United States Constitution First and Fourteenth Amendments.

237.    Plaintiff engaged in speech that is consistent with the mission of the FDNY.

238.    Plaintiff's reporting of Arroyo's firehouse sexual encounters and her other improper and flagrant violations of FDNY rules, regulations and codes, a matter of public concern, is speech protected by the First Amendment to the U.S. Constitution.

239.    Plaintiff's reporting of relentless department-wide gender-based, racial and/or color-based discriminatory conduct by the Defendants, a matter of public concern, in the filing of a charge of gender-based, racial and/or color-based discrimination with the EEOC on May 16, 2016, is speech protected by the First Amendment to the U.S. Constitution.

240.    Plaintiff's free speech right to report the above outweighed any interest of the Defendants in suppressing that speech.

241.    Acting under color of law, Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, willfully and maliciously deprived Plaintiff of rights, privileges, and immunities under the First Amendment of the U.S. Constitution by engaging in retaliation for Plaintiff's exercise of right of freedom of speech by retaliating in the form of adverse employment actions and by creating a hostile work environment for Plaintiff that was either severe or pervasive.

242.    As a result of Plaintiff's reporting of Arroyo's firehouse sexual encounters and her other  improper and flagrant violations of FDNY rules, regulations and codes, Plaintiff was retaliated against by demotion in position, change in work status, change in work duties, and the other aforementioned retaliatory conduct.

243.    As a result of Plaintiff's filing a charge of gender-based, racial and/or color-based discrimination, Plaintiff was retaliated against by demotion in position, change in work status, change in work duties, and the other aforementioned retaliatory conduct.

244.     Defendants, NYC, FDNY, De Blasio, Nigro and Leonard took such retaliatory measures against Plaintiff due to a pattern and an unequivocal policy or custom of retaliation implemented by the Defendants at the highest level of NYC and the FDNY.

245.     As a direct result of the actions, statements and/or policies of Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, Plaintiff suffered an unconstitutional deprivation of his rights under the First and Fourteenth Amendments to the U.S. Constitution.

246.     Defendants, NYC, FDNY, De Blasio, Nigro and Leonard acted intentionally and with callous disregard for Plaintiff's known statutory and constitutional rights.

247.     Defendants, NYC's, FDNY's, De Blasio's, Nigro's and  Leonard's conduct, as alleged in Count X caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a  viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, Plaintiff requests judgment on Count X of this lawsuit against, Defendants, NYC, FDNY, De Blasio, Nigro and Leonard jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

### COUNT XI – UNCONSTITUTIONAL PRIOR RESTRAINT VIOLATION OF FIRST AMENDMENT FREE SPEECH AND CIVIL RIGHTS (U.S. CONST. AMENDMENTS I & XIV, 42 U.S.C. 1983)

248.     Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

249.     Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, prohibited Plaintiff from speaking to anybody about Arroyo's firehouse sexual encounters and her other improper and flagrant violations of FDNY rules, regulations and codes, relentless department-wide gender-based, racial and/or color-based discriminatory conduct by the Defendants and Defendants' retaliatory demotion in position, change in work status, change in work duties, and the other aforementioned retaliatory conduct.

250.     At the same time, upon information and belief, Defendants, NYC, FDNY, De Blasio, Nigro, Leonard, Arroyo and Russo have told other persons falsehoods and defamatory accusations about Plaintiff.

251.     Defendants' NYC's, FDNY's, De Blasio's, Nigro's and Leonard's, prohibition to Plaintiff from speaking to anybody about Arroyo's firehouse sexual encounters and her other improper and flagrant violations of FDNY rules, regulations and codes, relentless department-wide gender-based, racial and/or color-based discriminatory conduct by the Defendants and Defendants' retaliatory demotion in position, change in work status, change in work duties, and the other aforementioned retaliatory conduct, constituted an unconstitutional prior restraint.

252.     As a direct result of the actions, statements and/or policies of Defendants, NYC, FDNY, De Blasio, Nigro and Leonard, Plaintiff suffered an unconstitutional deprivation of his rights under the First and Fourteenth Amendments to the U.S. Constitution.

253.    Defendants acted intentionally and with callous disregard for Plaintiff's known statutory and constitutional rights.

254.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's and Leonard's conduct, as alleged in Count XI, is due to a pattern and an unequivocal policy or custom implemented by the Defendants at the highest level of NYC and the FDNY.

255.    Defendants, NYC's, FDNY's, De Blasio's, Nigro's and  Leonard's conduct, as alleged in Count XI caused Plaintiff severe mental anguish, personal pain and suffering, loss of enjoyment of life, loss of a  viable career with the FDNY, loss of wages, bonuses and benefits and other compensation which such employment entails, future pecuniary losses, professional embarrassment and public humiliation.

WHEREFORE, Plaintiff requests judgment on Count XI of this lawsuit against, Defendants, NYC, FDNY, De Blasio, Nigro and Leonard jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees, expungement of all improper adverse references from Plaintiff's records, and such other and further relief as this Court may deem just and proper.

## COUNT  XII - TORTIOUS INTERFERENCE WITH CONTRACT

256.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

257.    Battalion Chief McGrath, during the course of his employment, engaged in oral and written contracts with Defendants, NYC, FDNY, De Blasio and Nigro, including without limitation those contracts formed on the basis of agreements comprised of collective bargaining

agreements, employee manuals and custom and practice with respect to: terms of employment; compensation; and the promises and representations that Defendants made to him.

258.    Defendants, Arroyo and Russo, with full knowledge of the contracts as alleged in Count XII, acting with malice, and outside the scope of their employment to advance their own personal interests, intentionally interfered with Plaintiff's said contracts with NYC and the FDNY and set out upon a course of action to induce the termination of Plaintiff's contracts.

259.    As a direct and proximate result of Defendants', Arroyo's and Russo's, malicious interference with Plaintiff's said contracts, Plaintiff has suffered a demotion in position, change in work status, change in work duties, change in routine, discontinuance and effective termination of his employment functions, financial loss as well as emotional distress.

WHEREFORE, Plaintiff requests judgment on Count XII of this lawsuit against Defendants, Arroyo and Russo, jointly and severally, for back pay, front pay, lost benefits, lost pension funds, including pre-judgment interest, liquidated damages, pecuniary and non-pecuniary compensatory damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees and such other and further relief as this Court may deem just and proper.

## COUNT  XIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

260.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

261.    Defendants, Leonard, Russo and Arroyo are and were aware that Battalion Commander McGrath is a highly decorated firefighter, proud of his accomplishments and his firehouse and that throughout his long career with the FDNY, Battalion Commander McGrath

had never been reprimanded, written up, investigated, or counseled in any way and has always had stellar evaluations and reviews.

262.    With full knowledge of the facts alleged in the preceding two paragraphs above, inclusive, Defendants, Leonard, Russo and Arroyo set out on a willful, malicious, extreme and outrageous course of action to intentionally cause Plaintiff severe emotional distress.

263.    The course of action alleged in the immediately preceding paragraph above, included without limitation continued perpetuation of falsehoods and defamatory statements and about Plaintiff.

264.    As a direct and proximate result of this extreme and outrageous conduct, Plaintiff suffered from extreme emotional distress that no reasonable person should be made to endure.


WHEREFORE, Plaintiff requests judgment on Count XIII of this lawsuit against Defendants, Leonard, Russo and Arroyo jointly and severally, for compensatory damages, punitive damages, all in  amounts to be proven at trial, costs of  this lawsuit, reasonable attorney's fees, and such other and further relief as this Court may deem just and proper.

## COUNT XIV - BREACH OF CONTRACT

265.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

266.    Battalion Chief McGrath, during the course of his employment, engaged in oral and written contracts with Defendants, NYC, FDNY, De Blasio and Nigro, including without limitation those contracts formed on the basis of agreements comprised of collective bargaining

agreements, employee manuals and custom and practice with respect to: terms of employment; compensation; and the promises and representations that Defendants made to him.

267.    Plaintiff reasonably and detrimentally relied upon the promises and agreements made by Defendants, NYC, FDNY, De Blasio and Nigro, and Defendants', NYC's, FDNY's, De Blasio's and Nigro's, past performance, in performing his obligations under the contracts alleged in Count XIV.

268.    Defendants, NYC, FDNY, De Blasio and Nigro, willfully and with malice, wrongfully and without just cause breached the contracts alleged in Count XIV.

269.    As a direct and proximate result of Defendants', NYC's, FDNY's, De Blasio's and Nigro's, conduct alleged in Count XIV Plaintiff has suffered pecuniary and general damages.

WHEREFORE, Plaintiff requests judgment on Count XIV of this lawsuit against Defendants, NYC, FDNY, De Blasio and Nigro, jointly and severally, for lost wages, lost benefits, lost pension funds, consequential damages, including pre-judgment interest, liquidated damages, punitive damages, all in amounts to be determined at trial, costs of this lawsuit, reasonable attorney's fees and such other and further relief as this court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, hereby requests a jury trial on all the triable issues raised in this Complaint.


Dated: March 15, 2017
      Syosset, NY


                        THE RANDO LAW FIRM P.C.
                        6800 Jericho Turnpike
                        Suite 120W
                        Syosset, NY 11791
                        (516) 799-9800

                        By: <u>/s/ Robert J. Rando</u>
                         Robert J. Rando (RR-5765)

                        CULLEN AND DYKMAN LLP
                        100 Quentin Roosevelt Boulevard
                        Garden City, NY 11530-4850
                        (516) 357-3700

                        By: <u>/s/ Cynthia A. Augello</u>
                        Cynthia A. Augello (CA-3839)

                        Attorneys for Plaintiff,
                        FDNY Battalion Commander McGrath

## EXHIBIT I

### ("THE CALENDAR GIRL")



# EXHIBIT II

# (EEOC RIGHT TO SUE LETTER)

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:   Michael McGrath
328 Beach 149th
Far Rockaway, NY 11694

From:   New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

|   | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |   |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2016-03216 | Holly M. Woodyard, State & Local Program Manager | (212) 336-3643 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

DEC 1 9 2016

Enclosures(s)

Kevin J. Berry,
District Director

(Date Mailed)

cc:
CITY OF NEW YORK FIRE DEPARTMENT
Attn: Director of Human Resources
9 Metrotech Center, 4th Floor
Brooklyn, NY 11201