UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MICHAEL MCGRATH,

Plaintiff,

-against-

FIRE DEPARTMENT OF THE CITY OF NEW
YORK, and THE CITY OF NEW YORK,

Defendants.

**MEMORANDUM & ORDER
17-CV-1461 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Michael McGrath brings this action against Defendants
Fire Department of the City of New York (the "FDNY") and the
City of New York (the "City") (collectively, "Defendants"). On
August 8, 2019, this court issued a Memorandum and Order
granting in part and denying in part Defendants' motion to dis-
miss. *McGrath v. Arroyo*, No. 17-CV-1461 (NGG) (RER), 2019
WL 3754459, at *18 (E.D.N.Y. Aug. 8, 2019) (dismissing claims
against individual defendants). Plaintiff's claims that survived
that motion are allegations of violations of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e-3 ("Title VII"), Section 296
of the New York State Human Rights Law, N.Y. Exec. Law § 296
("NYSHRL"), Sections 40-c and 40-d of the New York Civil Rights
Law, N.Y. Civ. Rights Law §§ 40-c & 40-d ("NYCRL"), and Section
8-107 of the New York City Human Rights Law, N.Y.C. Admin.
Code § 8–107 ("NYCHRL"), for wrongfully retaliating against
him on the basis of his race and gender. (*See generally* Am.
Compl. (Dkt. 32).) Pending before the court is Defendants' mo-
tion for summary judgment filed pursuant to Federal Rule of Civil
Procedure 56, which McGrath opposes. (Defs.' Not. of Mot. (Dkt.
134); Defs.' Mem. in Supp. of Mot. ("Mot.") (Dkt. 137); Pl.'s
Mem. in Opp'n. of Mot. ("Opp'n") (Dkt. 142); Defs.' Reply in
Supp. of Mot. ("Reply") (Dkt. 138).) For the reasons set forth
below, Defendants' motion for summary judgment is GRANTED.

## I.  BACKGROUND

### A.  Factual Background

Michael McGrath is a white, male, retired FDNY officer. (*See* Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt.") (Dkt. 136) ¶ 1.) McGrath began his career as a fireman at the FDNY in 1979 and was employed by the FDNY until he retired on February 15, 2018. (*See id.* ¶¶ 15, 155.) Throughout his career at the FDNY, he was promoted several times, eventually becoming Battalion Commander for FDNY Battalion 47 in Far Rockaway, Queens in 2003. (*See id.* ¶¶ 16-18.) Two years into his command of FNDY Battalion 47, Battalion 47 became a "joint facilit[y]" housing both Fire Operations and EMS Operations. (*Id.* ¶ 20; Pl.'s 56.1 Statement ("Pl.'s 56.1 Stmt.") (Dkt. 141 at ECF pp. 44-56) ¶ 3.) The court refers to the joint facility where McGrath worked as the "Firehouse." Both Fire Operations and EMS Operations housed in the Firehouse share common areas, including a gym, terrace, locker rooms, and bathrooms. (Defs." 56.1 Stmt. ¶ 21.)

In January 2014, McGrath met Marilyn Arroyo, an EMS Paramedic, when Arroyo was involved in a motor vehicle accident to which McGrath responded. (Pl.'s 56.1 Stmt. ¶¶ 9-10.) It is undisputed that McGrath and Arroyo met several times after they first met, (*see* Aug. 15, 2016 FDNY EEO Investigation Mem. from Cecilia Loving to Daniel A. Nigro ("Nigro Mem.") (Dkt. 135-10 at ECF pp. 13-16) at ECF p. 14), but the parties dispute whether these meetings were dates or "merely two co-workers getting together because Arroyo asked for job-related advice due to having family members interested in applying to the FDNY," (Pl.'s 56.1 Stmt. ¶ 11). McGrath claims that shortly after meeting Arroyo, he began hearing rumors that Arroyo was having sex with a firefighter inside of the Firehouse. (*See* Pl.'s 56.1 Stmt. ¶ 13.) McGrath first approached Arroyo's supervisor Chief Steven Russo with the allegations; Russo told McGrath that he would speak with Arroyo and get back to McGrath by the end of the day. (*See*

*id.* ¶ 18.) Russo did not get back to McGrath that day. (*See id.* ¶ 19.) On March 15, 2015, McGrath approached Arroyo and discussed the allegations with her.[1] (*See* Defs.' 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 20.) McGrath then brought the allegations to Assistant Chief Edward Baggott and Division Commander James DiDomencio. (*See* Pl.'s 56.1 Stmt. ¶¶ 30-31.) DiDomenico told McGrath that while the FDNY Bureau of Investigations and Trials ("BITs") was not going to investigate the allegations, Arroyo's EMS supervisor would speak with her. (*Id.* ¶ 33.) Shortly thereafter, DiDomenico instructed all Battalion Commanders (including McGrath) to give "drills on inappropriate behavior." (*Id.* ¶ 34.)

### 1. Arroyo FDNY EEO Complaint

On April 3, 2015, Arroyo submitted a complaint to the FDNY's Equal Opportunity Employment ("EEO") Office alleging that McGrath sexually harassed her. (*See* Defs.' 56.1 Stmt. ¶¶ 22, 47; Arroyo EEO Compl. (Dkt. 135-6).) The Arroyo FDNY EEO Complaint alleged that on March 15, 2015, McGrath asked Arroyo to meet him in the Firehouse's mechanical room, where McGrath "informed [Arroyo] that firemen's wives were making complaints about [Arroyo] with regard to rumors of inappropriate behavior with numerous firefighters from Battalion 47 as well as police officers from the local precincts." (Arroyo EEO Compl. at ECF p. 3.) Arroyo alleged further that McGrath "claimed that the wives were unhappy with [Arroyo] having a personal relationship with a 35 year old fireman from E268." (*Id.*) Arroyo claimed that McGrath said he could "make this all go away" if she agreed to

---

[1] The parties dispute how many times McGrath met with Arroyo regarding the allegations, as well as the content of these conversations. (*Compare* Defs.' 56.1 Stmt. ¶¶ 26-40 *with* Pl.'s 56.1 Stmt. ¶¶ 21-27.) Defendants also assert that in the weeks following McGrath's initial conversation with Arroyo about the allegations, McGrath discussed the allegations with other firefighters at the Firehouse. (*See* Defs.' 56.1 Stmt. ¶¶ 41-47.)

transfer to another EMS Station and gave her until the following day to let him know her decision. (*Id.*)

In March or April 2015, the FDNY reassigned McGrath to Queens Borough Command. (*See* Pl.'s 56.1 Stmt. ¶ 37.)[2] McGrath alleges that he was reassigned "without warning" and "stripped of his duties." (*Id.*) The FDNY asserts that it acted pursuant to FDNY policy: "The FDNY transfer policy states that when a member's unacceptable behavior, in violation of FDNY regulations and policies, is of such a serious nature as to affect the administrative or operational effectiveness of a unit, a FDNY member may be detailed pending the outcome of formal disciplinary proceedings." (Defs.' 56.1 Reply ¶ 40.) On April 6, 2015, the FDNY EEO Office assigned a lawyer to investigate Arroyo's complaint, and that lawyer conducted investigative interviews of the relevant individuals, including Arroyo, McGrath, and DiDomenico. (*See* Def.s' 56.1 Stmt. ¶ 52; Defs.' 56.1 Reply ¶¶ 43-44, 48-50.)

### 2. McGrath Agency Complaints

On May 16, 2016, McGrath filed his own complaints with the FDNY EEO Office, the New York State Department of Human Rights ("NYSDHR"), and the United States Equal Employment Opportunity Commission ("US EEOC") (collectively, "Agency Complaints"). (*See* Pl.'s 56.1 Stmt. ¶ 45; Jul. 13, 2016 Mem. to Don H. Nguyen ("Nguyen Mem.") (Dkt. 135-14).) According to an internal FDNY memorandum, McGrath's FDNY EEO complaint alleged that McGrath "was transferred and demoted due to his race (Caucasian) and gender (male), and that Arroyo received differential treatment because she is female and Hispanic." (Nguyen Mem.)

---

[2] McGrath asserts that he was reassigned on or about March 27, 2015, (*see* Pl.'s 56.1 Stmt. ¶ 37), while Defendants assert that McGrath was reassigned on April 9, 2015, (*see* Defs.' Reply to Pl.'s 56.1 Stmt. ("Defs.' 56.1 Reply") (Dkt. 138) ¶ 37).

### 3. Outcome of EEO Complaints

Determinations in both Arroyo's and McGrath's FDNY EEO complaints came later that year. On July 13, 2016, McGrath's FDNY EEO complaint was "administratively closed and . . . referred to the General Law Unit" because McGrath indicated during the intake meeting for his FDNY EEO complaint that he had also filed a complaint outside the FDNY. (*Id.* ("Pursuant to the New York Citywide Policy, externally filed cases shall be closed and forwarded to the Agency General Counsel for further review and handling."); *see also* Defs.' 56.1 Stmt. ¶¶ 70, 73, 75.)[3] With regard to Arroyo's FDNY EEO complaint, on August 15, 2016, the FDNY EEO Office issued a memorandum to the Fire Commissioner Daniel A. Nigro substantiating Arroyo's sexual harassment complaint against McGrath and recommending that "Arroyo and McGrath continue to be separated from working at the same location, and that McGrath be sent to EEO training and counseled by the [FDNY] EEO Office." (*See* Pl.'s 56.1 Stmt. ¶ 52; Nigro Mem. at ECF p. 16.) The memorandum recommended further that the matter be referred to BITs "for appropriate discipline." (Nigro Mem. at ECF p. 16.)[4]

---

[3] On June 28, 2016, the FDNY EEO Office received a copy of McGrath's NYSDHR complaint, which was "cross-filed" with McGrath's US EEO Complaint. (Nguyen Mem.)

[4] McGrath submitted a draft version of the FDNY EEO Office memorandum dated August 5, 2016 that substantiated Arroyo's complaint and recommended that he continue to be separated from Arroyo, but had slightly different language in the recommendation section. (*See* Aug. 5, 2016 Draft FDNY EEO Investigation Mem. ("Draft Nigro Mem.") (Dkt. 140-17).) For example, the Draft Nigro Memorandum noted that McGrath served in the FDNY for "over 37 years . . . with an unblemished record" and that McGrath was detailed from his Battalion to the Queens Borough Command immediately after Arroyo filed the FDNY EEO complaint against McGrath, and McGrath "ha[d] been there ever since." (*Id.* at 11.) The Draft Nigro Memorandum was later updated and presented by Cecilia Loving to Commissioner Daniel A. Nigro for his review and adoption. (*See* Nigro Mem.)

On September 9, 2016, BIT served McGrath with four charges under the FDNY's internal rules and regulations relating to sexual harassment, making false statements, and general conduct. (*See* Pl.'s 56.1 Stmt. ¶ 58; Defs.' 56.1 Stmt. ¶ 60-61.) As to McGrath's NYSDHR complaint, the NYSDHR issued a "no probable cause" determination on November 10, 2016 dismissing McGrath's complaint. (*See* Defs.' 56.1 Stmt. ¶ 78 (citing NYSDHR Determination and Order After Investigation (Dkt. 135-16)).)

### 4.   The Award and Medal Day

FDNY firefighters who complete heroic acts are eligible for awards as determined by the FDNY's Board of Merit, a rotating panel of five FDNY chiefs. (*See* Defs.' 56.1 Stmt. ¶¶ 81-82.) When a meritorious act is submitted to the Board of Merit, the employee's supervisor recommends a specific class of award, listed as follows from highest to lowest class: Class I, Class II, Class III, Class A, or Class B. (*See id.* ¶¶ 93, 88.) The Board of Merit then votes for which class of award each nominee should receive and the votes for each nominee are tabulated as follows: Class I votes are worth seven points, Class II votes worth six points, Class III votes are worth five points, Class A votes are worth four points, and Class B votes are worth three points. (*See id.* ¶¶ 88, 90-91.) The awards are determined by a tally of points determined by the Board vote, and the list of medal recipient candidates is reviewed by senior FDNY leadership before the final awards are issued. (*See id.* ¶¶ 90, 96, 107.) Generally, approximately 40 to 45 FDNY employees receive a medal on Medal Day held annually during the first Wednesday of June. (*See id.* ¶¶ 99, 97.) While recipients of Class I, II or III awards are always invited to attend the ceremony, the parties dispute the extent to which recipients of Class A or B awards are invited to attend. (*See id.* ¶¶ 99-102.) Recipients of Class A or B awards who do not receive a medal on Medal Day nevertheless receive an award for their meritorious act, including a medal and uniform insignia. (*See id.* ¶ 105.)

On August 13, 2016, McGrath performed an off-duty water rescue of four individuals caught in a rip tide. (*See* Pl.'s 56.1 Stmt. ¶ 62.) As McGrath was not on duty during the rescue, McGrath submitted a meritorious act form to his supervisor DiDomenico. (*See id.* ¶¶ 64, 66.) DiDomencio recommended McGrath for a Class III award for McGrath's rip tide rescue. (*See* Defs.' 56.1 Stmt. ¶ 113.) On December 15, 2016, the Board of Merit awarded McGrath a total of 21 points and voted to give McGrath a Class A award for his rip tide rescue. (*See id.* ¶¶ 114, 118.) While Plaintiff was asked to complete a "medal day winner bio form" on March 16, 2017, (*see* Defs.' 56.1 Reply ¶ 77), the parties dispute whether McGrath was invited to attend Medal Day, (*see* Defs.' 56.1 Stmt. ¶ 119). However, McGrath asserts that, after he filed the instant action on March 15, 2017, he learned on or around May 5, 2017 that he was not invited to Medal Day. (*See* Pl.'s Counterstatement of Additional Material Facts ("Pl.'s 56.1 Counter Stmt.") (Dkt. 141 at ECF pp. 1-44) ¶ 119 (noting that another firefighter William Felton who received fewer points for the same water rescue was invited to Medal Day); Pl.'s 56.1 Stmt. ¶ 85.) McGrath discussed appealing the decision with DiDomenico. (*See* Defs.' 56.1 Stmt. ¶¶ 122-24.)

### 5. McGrath's Disability Pension

On January 16, 2018, the same day McGrath filed for retirement effective February 16, 2018, McGrath applied for a "Service Incurred Disability" pension. (*See* Defs.' 56.1 Stmt. ¶¶ 153-54.) In his application for the Service Incurred Disability pension, he claimed several categories of disabilities such as respiratory conditions and post-traumatic stress disorder ("PTSD") arising from his work at the World Trade Center following the September 11, 2001 terrorist attacks ("9/11"), and a spine and knee injury he claimed occurred as a result of a slip and fall in 2016. (*See id.* ¶¶ 144, 161; Pl.'s 56.1 Stmt. ¶¶ 91-92.) FDNY firefighters may retire

with a non-disability service retirement after completing 20 years of uniformed service. (*See* Defs.' 56.1 Stmt. ¶ 126.)

FDNY firefighters may also apply for one or both types of supplemental disability pensions: ordinary (non-service connected) or accidental (service connected). (*See id.* ¶¶ 126-27.) There are three layers of review for disability pensions. (*See id.* ¶¶ 128-43.) First, the FDNY Bureau of Health Services Medical Board ("BHS Medical Board") must make a "fitness for duty" determination. (*See id.* ¶ 131.) For any member found permanently unfit for duty by the BHS Medical Board, the Fire Commissioner must apply for the disability retirement with the 1-B Medical Board—a panel of three physicians that is independent of the FDNY and Pension Board of Trustees. (*See id.* ¶¶ 133-37, 140.) The 1-B Medical Board reviews the disability application and any supporting evidence from the applicant, and makes a determination that binds the Pension Board of Trustees as to whether the firefighter is disabled for retirement purposes, and makes a recommendation to the Pension Board of Trustees on whether the disability was caused by an accident in the firefighter's line of duty. (*See id.* ¶¶ 136-38.) The Pension Board of Trustees is comprised of City and Union representatives and makes the final determination. (*See id.* ¶ 142.) While the Pension Board of Trustees cannot change the 1-B Medical Board's determination on whether a firefighter is permanently disabled, it can overrule the 1-B Medical Board's recommendation on the cause of the disability. (*See id.* ¶ 143.)

On April 7, 2017, the BIT requested that a hold be placed on any of McGrath's existing or future retirement applications because of the ongoing adjudication arising from Arroyo's substantiated FDNY EEO complaint. (*See id.* ¶¶ 150-52.) On February 16, 2018, the day after McGrath's retirement became effective, this hold was lifted and he started receiving his non-disability pension approximately fifteen days later. (*See id.* ¶¶ 155-57.) On April 4,

2018, the 1-B Medical Board considered his application for disability payments for the first time. (*See id.* ¶ 163.) As to his right knee and spinal injuries, the 1-B Medical Board found that while he was considered "permanently disabled" and thus unfit for duty, his disability was caused by chronic degenerative diseases, rather than a 2016 slip and fall or any other service-related activities. (*See id.* ¶¶ 165-66, 183-84.) The 1-B Medical Board also denied his application with respect to his PTSD, finding that although he may have had symptoms in the past, he was "not permanently disabled due to a psychological illness." (*See id.* ¶¶ 179-80.) Accordingly, the 1-B Medical Board recommended to the Pension Board of Trustees that McGrath receive ordinary disability payments, rather than accident disability. (*See id.* ¶¶ 167, 184.) On June 27, 2018 the Pension Board of Trustees reviewed McGrath's case and directed that the 1-B Medical Board review a statement from McGrath dated June 19, 2018 and additional medical documentation from a 2002 magnetic resonance imaging ("MRI") exam of his spinal injury. (*See id.* ¶¶ 185-86.) On September 14, 2018, the 1-B Medical Board reviewed his application a second time. (*See id.* ¶¶ 187.) The 1-B Medical Board reaffirmed its earlier decision, finding that McGrath's MRI records supported its finding of a degenerative spinal condition. (*See id.* ¶¶ 190, 192-93.) The 1-B Medical Board reviewed McGrath's case again on February 6, 2019 and February 8, 2019, but did not change its initial determination. (*See id.* ¶¶ 198, 203, 204, 209.) On April 11, 2019, McGrath's attorney sent the Pension Board of Trustees a letter and memorandum further asserting McGrath's entitlement to a disability pension. (*See id.* ¶ 212.) On April 24, 2019, the Pension Board of Trustees reviewed McGrath's case again and directed the 1-B Medical Board to review the letter from McGrath's attorney and the minutes from the Pension Board of Trustees' April 24, 2019 meeting. (*See id.* ¶¶ 213-14.) On June 19, 2019, the 1-B Medical Board met and concluded that "there [was] still no new medical evidence that

would lead [them] to modify [their] findings in this case." (*See id.* ¶¶ 216-21.) On June 21, 2019, the 1-B Medical Board met again to review a letter from McGrath's attorney but again concluded that his spinal injuries were "causally related to chronic degenerative disease." (*See id.* ¶¶ 222, 229-30.)

On November 7, 2019, after a fifth review of McGrath's case, and an additional interview and medical examination of McGrath focusing on McGrath's respiratory issues, the 1-B Medical Board recommended to the Pension Board of Trustees that McGrath be granted a disability pension for 9/11-related upper respiratory tract disease, noting that his condition had worsened since its previous evaluation of McGrath. (*See id.* ¶¶ 235-41). On December 20, 2019, the Pension Board of Trustees approved McGrath's service-incurred disability retirement. (*See id.* ¶ 242.) McGrath started receiving payments in early 2020 and also received back payments retroactive to the date of his retirement in February 2018. (*See id.* ¶¶ 243-44.)

## B. Procedural Background

On March 15, 2017, McGrath commenced this action against Marilyn Arroyo, Steven Russo, James Leonard, Daniel Nigro, Mayor Bill DeBlasio, the FDNY, and the City, alleging racial discrimination and retaliation under federal, state, and local laws, violation of his free speech rights, and several tort and contract claims. (*See generally* Compl. (Dkt. 1).) On December 5, 2017, Defendants filed their fully-briefed motion to dismiss the Complaint. (*See* First Mot. to Dismiss (Dkt. 24); Opp'n to First Mot. to Dismiss (Dkt. 26); Reply in Supp. of First Mot. to Dismiss (Dkt. 27).) On August 3, 2018, McGrath filed an Amended Complaint. (*See generally* Am. Compl. (Dkt. 32).) On February 15, 2019, defendants filed their fully-briefed motion to dismiss the Amended Complaint (Second Mot. to Dismiss (Dkt. 39); Opp'n to Second Mot. to Dismiss (Dkt. 42); Reply in Supp. of Second Mot. to Dismiss (Dkt. 44).) On August 8, 2019, the court dismissed all

10

claims against defendants except for "(1) Title VII retaliation against FDNY and the City, (2) [NYSHRL] and NYCRL retaliation against FDNY and the City, and (3) NYCHRL retaliation claim against FDNY and the City." *See McGrath*, 2019 WL 3754459, at *18.

On January 3, 2024, the court denied McGrath's motions for leave to amend his complaint for a second time as futile. (*See* Jan. 3, 2024 Order.) On February 9, 2024, the court denied McGrath's motion for reconsideration of the court's January 3, 2024 order. *McGrath v. Arroyo*, No. 17-CV-1461 (NGG) (JRC), 2024 WL 531251, at *4 (E.D.N.Y. Feb. 9, 2024).

Pending before the court is Defendants' fully-briefed motion for summary judgment as to McGrath's remaining retaliation claims. (*See* Mot.; Opp'n; Reply.)

## II. LEGAL STANDARD

To obtain Rule 56(a) relief, movants must "identify[] each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Movants are entitled to summary judgment if they "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 68 (2d Cir. 2024). A fact is material when it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Gayle v. Gonyea*, 313 F. 3d 677, 682 (2d Cir. 2002).[5] "For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute 'to require a jury or judge to resolve the parties' differing versions of

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

the truth at trial.'" *Goldberg v. City of New York*, No. 19-CV-4241 (GBD) (KHP), 2021 WL 4482149, at *3 (S.D.N.Y. Sept. 30, 2021) (quoting *Anderson*, 477 U.S. at 249). However, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

"The movant carries the burden of proving that no genuine factual dispute exists." *Arce v. Sovereign Indus. Grp. Inc.*, No. 19-CV-489 (NGG) (JRC), 2025 WL 102449, at *3 (E.D.N.Y. Jan. 15, 2025) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Even where, as here, there are cross-motions for summary judgment, "each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988). In reviewing a summary judgment motion, the court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). However, the court need not draw any inference that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To defeat a motion for summary judgment, the nonmoving party must provide "hard evidence," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). Parties "cannot rely on inadmissible hearsay in opposing a motion for summary judgment." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985). The court relies on "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" to determine whether summary judgment is appropriate. *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003); *see also* Fed. R. Civ. P. 56(c).

## III. DISCUSSION

Title VII, the NYSHRL, the NYCRL, and the NYCHRL prohibit employers from retaliating against employees for opposing discriminatory employment practices. The court addresses McGrath's claims brought under federal and state law together, then turns to his claim brought under New York City law.

### A.  Applicable Law

#### 1.  Title VII, NYSHRL, and NYCRL

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter.'" *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 330 (S.D.N.Y. 2020) (quoting 42 U.S.C. § 2000e-3(a)). "The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because [he] 'has opposed any practices forbidden under this article or because. . . [he] has filed a complaint, testified or assisted in any proceeding under this article." *Id.* (quoting N.Y. Exec. Law § 296(7)). "[F]acts sufficient to sustain a cause of action under [NYSHRL §] 296 will support a cause of action under [S]ection 40-c of the [NYCRL]."[6] *Hyman v. Cornell Univ.*, No. 15-CV-792 (FJS) (ATB), 2017 WL 1194231, at *10 (N.D.N.Y. Mar. 30, 2017), *aff'd*, 721 F. App'x 5 (2d Cir. 2017).

___

[6] Section 40-d of the NYCRL creates a cause of action based on violation of Section 40-c. *McGrath*, 2019 WL 3754459, at *13 n.6.

At summary judgment, retaliation claims under Title VII and the NYSHRL are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (applying *McDonnell Douglas* framework to Title VII claim); *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (applying *McDonnell Douglas* framework to NYSHRL claim). "Under the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013). The Second Circuit has reasoned that an adverse employment action is a "materially adverse change in the terms and conditions of employment." *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 85 (2d Cir. 2001) (noting that indicators of a materially adverse change are "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation") (*abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). The plaintiff must show that the retaliation was a "but-for" cause for the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). The burden of production then shifts to the employer to "articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845. Finally, the plaintiff must then show that defendant's non-retaliatory reason for its conduct "is a mere pretext for retaliation." *Id.*

### 2. NYCHRL

Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). "To prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (N.Y. 2011) and *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 33-34 (1st Dep't 2009).)

The Second Circuit has emphasized that "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109, 110 n.8 (noting that "[i]t is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims" and declining to resolve the issue). New York courts have broadly construed the NYCHRL's retaliation provision. *See Albunio*, 16 N.Y.3d at 477-78 (noting that Section 8-107(7) must be construed broadly in favor of plaintiffs "to the extent that such a construction is reasonably possible"); *see also Williams*, 872 N.Y.S.2d at 34 ("[N]o challenged conduct may be deemed non-retaliatory before a determination that a jury could not reasonably conclude from the evidence" that the challenged conduct was reasonably likely to deter the NYCHRL plaintiff from engaging in protected activity).

### B. The FDNY is not a suable entity

As an initial matter, the court grants Defendants' motion for summary judgment as to McGrath's claims against the FDNY because the FDNY is not a suable entity. (*See* Mot. at 21 (arguing that McGrath's claims against the FDNY should be dismissed).) Under

the New York City Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter ch. 17, § 396. Accordingly, the court dismisses McGrath's claims against the FDNY because the FDNY lacks the capacity to be sued. *See Ximenes v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008) ("Section 396 of the [New York City] Charter has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued.") (per curiam); *Fahey v. City of New York*, No. 10-CV-4609 (ILG) (MDG), 2012 WL 413990, at *5 (E.D.N.Y. Feb. 7, 2012) (granting summary judgment as to all claims against the FDNY because it is not a suable entity) (collecting cases).

### C. Application

#### 1. Title VII, NYSHRL, NYCRL

##### a. *McGrath's prima facie retaliation case*

The parties agree that McGrath engaged in protected activity when he filed his Agency Complaints, and when he filed his Complaint with this court. (Mot. at 5; Opp'n at 6.) Accordingly, his earliest protected activity was when he filed his Agency Complaints on May 16, 2016 alleging that he was being discriminated against because of his race and gender. (*See* Pl.'s 56.1 Stmt. ¶ 45; Defs.' 56.1 Stmt. ¶¶ 66, 69.)

Defendants were made aware of the Agency Complaints on the day when McGrath submitted them because he physically appeared at the FDNY's EEO Office to submit his FDNY EEO complaint, and also informed the office that he had filed an external complaint. (*See* Nguyen Mem.)

McGrath argues that he suffered from several adverse employment actions after he submitted his Agency Complaints and after he filed his Complaint with this court on March 15, 2017. These

16

actions concern Defendants' handling of McGrath's FDNY EEO complaint, Arroyo's FDNY EEO complaint, McGrath's disability pension application, McGrath's award at Medal Day, and Defendants' decision to station Arroyo at a location near where McGrath frequents to pick up his medications. The court addresses each of these in turn.

### b.  McGrath's FDNY EEO complaint

McGrath points to the FDNY EEO Office's failure to investigate his FDNY EEO complaint as retaliatory. (*See* Opp'n at 8-9 (citing *Arkorful v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 3d 336 (E.D.N.Y. 2024)).) However, *Arkorful* is inapposite. In *Arkorful*, the court concluded that the New York City Department of Education's failure to investigate plaintiff's 2019 Office of Equal Opportunity ("OEO") complaints following his 2016 complaint with the US EEOC was an adverse employment action. 712 F. Supp. 3d at 357-58 ("Failure to investigate a complaint can constitute an adverse employment action for purposes of a retaliation claim *if the complaint is distinct from another separate, protected activity.*") (emphasis added) (citing *Delisi v. Nat'l Ass'n. of Professional Women, Inc.*, 48 F. Supp. 3d 492, 497 (E.D.N.Y. 2014). In both *Arkorful* and *Delisi*, the defendants failed to investigate employee-plaintiffs' complaints to defendants because plaintiffs had made earlier, separate complaints to the US EEOC. 712 F. Supp. 3d at 357-58; 48 F. Supp. 3d at 497. However, unlike the plaintiffs in *Arkorful* and *Delisi* McGrath never filed a "subsequent" complaint with the FDNY EEO Office after he filed his complaints with the US EEOC or NYSDHR. 712 F. Supp. 3d at 358 (noting that plaintiff's "2019 OEO Complaints contained allegations of *subsequent discriminatory conduct* that took place after the filing of the [US] EEOC complaint and the filing of this lawsuit") (emphasis added). Furthermore, in *Arkorful* the court found that the defendant did not offer a legitimate reason for its decision not to investigate or explain the OEO's "purported" policy requiring that internal complaints be closed when external complaints are filed

based on the same facts. *Id.* Here, Defendants have entered their policy into the record and supplied evidence explaining its application to McGrath's FDNY EEO complaint. (*See* FDNY EEO Policy (Dkt. 140-1) at 15 ("Complaints filed with agencies outside FDNY . . . that are based on the same facts and circumstances as a complaint filed with the FDNY EEO Office shall be forwarded to the Deputy Commissioner of Legal Affairs and generally, the General Law Unit, for handling, defending or resolving any claims filed with the external agency."); Nguyen Mem. ("During the May 16 intake, McGrath indicated to the EEO Office that he had filed an external complaint. . . . As such, the instant case is administratively closed and has been referred to the General Law Unit.").) Accordingly, Defendants' discontinuation of their investigation of McGrath's FDNY EEO complaint was not an adverse employment action.

c.    Arroyo's FDNY EEO complaint

The court notes at the outset that when an employer "undertakes a fact-finding investigation" in response to a complaint of wrongful conduct, the Second Circuit has cautioned lower courts against finding the investigation itself to be retaliatory because "the law must give breathing room for such investigations to be carried out." *Cox v. Onondaga Cnty. Sheriff's Dep't,* 760 F.3d 139, 146-47 (2d Cir. 2014) (collecting cases). However, the *Cox* court also noted that "an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment, constructive discharge, or other employment consequences of a negative nature, or if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 147 (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006)). Having already dismissed McGrath's hostile work environment, constructive discharge, discrimination, First Amendment free speech, breach of contract, tortious interference with a contract, and intentional infliction of emotional distress

claims, *see generally McGrath*, 2019 WL 3754459. Defendants' argument that their investigation of Arroyo's FDNY EEO complaint is not an adverse employment action is persuasive, (Reply at 3).[7]

It is undisputed that McGrath was placed under oath as part of an FDNY EEO Office interview conducted in connection with Arroyo's FDNY EEO complaint in July 2016. (*See* Pl.'s 56.1 Stmt. ¶ 50.) While the court takes notice that the interviews that the FDNY conducted of other witnesses as part of that investigation did not have court reporters present and were not conducted under oath, (*see* Hilit Tolani Deposition Transcript 87:13-89:22), the court credits Defendants' argument that McGrath "fails to cite any evidence aside from his own testimony to support his novel contention that the EEO Office cannot conduct interviews under oath, and in fact no provision of the EEO Policy prohibits such interviews," (Reply at 4 (citing FDNY EEO Policy)). Indeed, the section of the FDNY EEO Policy titled "Interviews and the Obligation to Cooperate" describes interviewees' right to have a union representative or attorney present during interviews and does not proscribe conducting sworn interviews. (*See* FDNY EEO Policy at 16-17.) There is nothing inherently adverse about being interviewed under oath as part of a sexual harassment investigation. Accordingly, the FDNY EEO Office's sworn interview of McGrath was not an adverse employment action.[8]

---

[7] McGrath's argument that the FDNY "suddenly revived" its investigation of Arroyo's FDNY EEO complaint after he filed his FDNY EEO complaint is unpersuasive. (*See* Opp'n at 9-10). The FDNY EEO Office conducted multiple interviews before McGrath filed his complaints on May 16, 2016: McGrath on January 5, 2016, and Arroyo on April 6, 2015. (*See* Nguyen Mem.; Final Investigative Memorandum ("Final Invest. Mem.") (Dkt. 135-10 at ECF pp. 1-12) at ECF p. 3 nn. 1, 2).)

[8] McGrath also argues that Defendants "harassed" McGrath by calling McGrath in for a BIT disciplinary hearing while he was on medical leave. (*See* Opp'n at 12-13; Pl.'s 56.1 Stmt. ¶ 105 (citing McGrath Deposition Transcript ("McGrath Dep. Tr.") (Dkt. 140-12).)) McGrath testified at his deposition that it was

Finally, McGrath asserts that the FDNY EEO Office's substantiation of Arroyo's claims against him and the subsequent four charges that arose from the referral to BIT were an adverse employment action.[9] On September 9, 2016, BIT served McGrath with four charges under the FDNY's internal rules and regulations relating to sexual harassment, making false statements, and general conduct. (*See* Pl.'s 56.1 Stmt. ¶ 58; Defs.' 56.1 Stmt. ¶ 61.) Courts have opined that disciplinary charges resulting from an investigation may qualify as retaliation. *See e.g.*, *McGrath*, 2019 WL 3754459, at *11; *Monclova v. City of New York*, No. 5-CV-3164 (DGT), 2008 WL 822117, at *7 (E.D.N.Y. Mar. 26, 2008) ("[D]isciplinary charges against plaintiffs are . . . an adverse employment action for the purpose of making out a prima facie case of retaliation. . . . [Because] charges of this sort can have significant future consequences for employment and could reasonably dissuade an employee from raising a claim of discrimination."). Accordingly, the court finds that the FDNY's

---

against FDNY policy to require him to appear for an interview or hearing while he was on medical leave. (*See* McGrath Dep. Tr. 97:18-22, 106:14-17.) However, McGrath "cites no evidence that attempting to hold a disciplinary hearing while he was on medical leave violated any FDNY rule or regulation," (Reply at 5), and McGrath does not otherwise show how this constitutes a "materially adverse change in the terms and conditions of [his] employment," *see Weeks*, 273 F.3d at 85; *Cox*, 760 F.3d at 147.

[9] McGrath also asserts that edits made to the FDNY EEO Office memorandum recommending the case to BIT for discipline exacerbated that harm. (*See* Opp'n at 10-11 (citing Nigro Mem. and Draft Nigro Mem.).) Specifically, McGrath points to the Draft Nigro Memorandum's recommendation section which notes McGrath's 37 years of service "with an unblemished record" and does not include a referral to BIT for discipline, (*see* Draft Nigro Mem. at 11), whereas the Nigro Memorandum dated 10 days later does not reference McGrath's record in the recommendation section and includes a referral to BIT for discipline, (*see* Nigro Mem. at ECF p. 16). However, McGrath provides no evidentiary support for his assertion that the draft report was revised "after [it] was reviewed, presumably by the FDNY Commissioner." (*See* Opp'n at 11.) Nevertheless, the Draft Nigro Memo has in-line comments and tracked changes from its authors, (*see* Draft Nigro Mem. at 3), demonstrating that it was likely not the FDNY EEO Office's final position.

substantiation of Arroyo's claims and the subsequent charges that arose from the referral to BIT were an adverse employment action.

However, to establish his prima facie case of retaliation, McGrath must also show that there was "a causal connection between [his] protected activity and [Defendants'] adverse employment action." *Zann Kwan*, 737 F.3d at 844; *Nassar*, 570 U.S. at 362 (requiring a showing of "but-for" causation). McGrath's only theory of causation is the temporal proximity between Defendants' alleged adverse employment actions and his protected activity. (*See* Opp'n at 16-19.) Specifically, McGrath notes that immediately after McGrath informed Arroyo's supervisor Russo about the allegations McGrath had heard about Arroyo's conduct in the Firehouse steam room, he was "banished" to Queens Borough Command. (Opp'n at 17; Final Invest. Mem. at ECF p. 10 (noting that McGrath was "detailed to Queens Borough Command in the beginning of April 2015").) However, this cannot support McGrath's causation argument because McGrath was not engaging in a protected activity when he reported Arroyo's alleged sexual affairs to her supervisor. Complaining of a colleague's alleged sexual affairs is not a protected activity. As explained *supra*, McGrath's earliest protected activity was when he submitted his Agency Complaints on May 16, 2016. (*See* Nguyen Mem.) *Sealy v. State Univ. of N.Y. at Stony Brook*, 408 F. Supp. 3d 218, 227 (E.D.N.Y. 2019) ("It is axiomatic that for any conduct to be deemed actionable as retaliation, it must occur *after* the protected activity.") (emphasis added), *aff'd*, 834 F. App'x 611 (2d Cir. 2020).

Next, McGrath points to the fact that the FDNY EEO Office interviewed him again in connection with Arroyo's complaint in July

2016,[10] almost two months after he filed his FDNY EEO complaint and despite having already interviewed him on January 5, 2016. (*See* Opp'n at 17-18; Final Invest. Mem. at ECF p. 3 n. 2). Indeed, the FDNY interviewed several people in connection with Arroyo's complaint after McGrath filed his FDNY EEO complaint, including Arroyo, O'Hal, and Chief Gary Rocco. (Final Invest. Mem. at ECF p. 3 n. 1, p. 10 n. 15.) On August 15, 2016, the FDNY substantiated Arroyo's complaint against McGrath, (*see* Nigro Mem. at ECF p. 13.), and three weeks later, the BIT served McGrath with disciplinary charges under the FDNY's internal rules and regulations, (*see* Pl.'s 56.1 Stmt. ¶ 58; Defs.' 56.1 Stmt. ¶ 61). That this all happened within a five-month period after McGrath filed his FDNY EEO compliant does not create a sufficient causal link because "[t]emporal proximity alone is insufficient to defeat summary judgment." *Zann Kwan*, 737 F.3d at 847. Further, the FDNY EEO Office's investigation of Arroyo's complaint predated McGrath's FDNY EEO complaint. (*Compare* Nguyen Mem. (McGrath made his FDNY EEO complaint on May 16, 2016) *with* Final Invest. Mem. at ECF p. 3 nn. 1 (Arroyo interviewed in connection with her complaint on April 6, 2015), 2 (McGrath interviewed in connection with Arroyo's complaint on January 5, 2016).) Accordingly, McGrath has not shown that "but-for" his protected activities the FDNY would not have substantiated Arroyo's complaint against him or brought disciplinary charges. *See Nassar*, 570 U.S. at 362.

### d.   McGrath's disability pension application

McGrath also claims that the FDNY's placement of his disability pension and retirement application on hold and its numerous subsequent denials of his disability pension constitute adverse

---

[10] The parties agree that McGrath's second interview took place in July 2016, but dispute whether it took place on July 6, 2016 or July 8, 2016. (Defs.' 56.1 Reply ¶ 50.) The court need not and does not resolve this immaterial factual dispute.

employment actions. (Opp'n at 15-16.) The court looks to the undisputed record. As part of the BIT's disciplinary proceedings concerning McGrath, on April 7, 2017, the BIT informed the Director of the Pension Board of Trustees and other relevant officers that McGrath was "the subject of a pending BIT case" and requested that a hold be placed on any existing or new retirement applications. (Defs.' 56.1 Stmt. ¶¶ 150-52.) On January 16, 2018, McGrath filed for retirement and a Service Incurred Disability pension. (*See id.* ¶¶ 153-54.) On February 16, 2018, the day after McGrath's retirement became effective, the hold on his retirement application was lifted and McGrath started receiving a non-disability pension. (*See id.* ¶¶ 156-57.)

However, between April 4, 2018 and November 7, 2019, the 1-B Medical Board and the Pension Board of Trustees denied his disability pension by concluding multiple times that McGrath's physical condition was not a result of his FDNY service, and he did not suffer from PTSD, even if he may have previously had symptoms. (*See id.* ¶¶ 163, 165-67, 179-80, 183-86, 190, 192-93, 198, 203-204, 209, 213-214, 222, 229-30.) During this period, McGrath retained an attorney to advocate on his behalf before the relevant boards. (*See id.* ¶¶ 212, 222, 229-30.) On November 7, 2019, after an additional interview and medical examination of McGrath focused on McGrath's respiratory issues, the 1-B Medical Board recommended to the Pension Board of Trustees that McGrath be granted additional accidental disability retirement for his 9/11-related upper respiratory tract disease, noting that his condition had worsened since its previous evaluation of McGrath. (*See id.* ¶¶ 239-41.) The Pension Board of Trustees approved McGrath's Service Incurred Disability pension the following month, and McGrath started receiving payments in early 2020, including back payments retroactive to the date of his retirement. (*See id.* ¶¶ 242-44.)

McGrath's claim that he suffered an adverse employment action because his disability pension application was placed on hold and denied several times before ultimately being approved is unavailing. While McGrath contends that "there are no laws, rules or regulations that state holds are appropriate for individuals seeking a disability pension with charges pending," (*see* Pl.'s 56.1 Counter Stmt. ¶ 149), the evidence demonstrates that there was a longstanding policy in place that explains why McGrath's disability pension application was put on hold, (Defs.' 56.1 Stmt. ¶ 149). Both the Deputy Director and Assistant Commissioner of BIT testified that McGrath's disability pension application was put on hold pursuant to BIT's longstanding policy.[11] (*See* Joseph Palazzolo Deposition Transcript (Dkt. 135-32) 117:23-118:3 ("[W]henever a fire member is served with charges, if there are any allegations of misconduct we place a pension hold on every single member."), 118:14-23 ("If it's a disability retirement where they're receiving a disability pension, the Department will place what's known as a pension hold on them while an investigation is pending, charges are pending, and my understanding is while that pension hold is in place, the member can't be seen by the 1-B Board, which would be reviewing their application for a disability retirement."); Robert Wallace Deposition Transcript (Dkt. 135-24) 58:11-19 ("So if a fire fighter or an EMT seeks to retire through normal retirement process, the Department would have 30 days by which to effectuate any charges or discipline if the case may be within that 30-day period. However, the Department could place a hold on disability applications, and did as a standard operating procedure.").) Accordingly, this factual dispute on whether there was a policy in place does not require a jury to "resolve the parties' differing versions of the truth at trial." *Goldberg*, 2021 WL 4482149, at *3. Because Defendants were

---

[11] When agency practices are "wide-spread" and "long-standing," they can "constitute unwritten policies or customs." *See Rounds v. Thompson*, No. 9:12-CV-953 (GLS) (TWD), 2013 WL 3187074, at *2 (N.D.N.Y. June 20, 2013).

acting pursuant to FDNY policy and the hold was ultimately lifted, Defendants' placement of McGrath's disability pension application on hold was not an adverse employment action.

McGrath likewise fails to convince the court that the 1-B Medical Board and Pension Board of Trustees' initial denials of his disability pension after the hold was lifted constitute an adverse employment action. "In determining whether a plaintiff suffered 'adverse consequences' after a rescinded [determination by plaintiff's employer], courts have focused on whether the defendant restored plaintiff to [his] previous. . . benefits." *Shultz v. Congregation Shearith Israel of the City of New York*, 202 F. Supp. 3d 411, 418 (S.D.N.Y. 2016), *aff'd in part, vacated in part, remanded sub nom. Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298 (2d Cir. 2017). Because McGrath ultimately received a disability pension, including back payments dating to when he first retired, (*see* Defs.' 56.1 Stmt. ¶¶ 242-44), his initial denials also do not qualify as adverse employment actions, *see Carvalho v. Associated Brands, Inc.*, No. 15-CV-72 (RJA) (MJR), 2016 WL 8709809, at *11 (W.D.N.Y. May 13, 2016) (reasoning that there was no adverse employment action because defendant provided disability carrier with the documentation that plaintiff requested and submitted evidence that "plaintiff was granted both short and long term disability benefits"), *report and recommendation adopted*, No. 15-CV-72 (MAT), 2017 WL 405403 (W.D.N.Y. Jan. 31, 2017), *aff'd*, 707 F. App'x 742 (2d Cir. 2017).

### e.  Medal Day

McGrath's receipt of a Class A award in place of the Class III award for which he was originally recommended does not constitute an adverse employment action. McGrath has not put forward any evidence of improprieties within the Board of Merit's vote taken on December 15, 2016 that could have caused the withholding of the more prestigious Class III award. (*See* Opp'n at 13-14.) McGrath's only potentially cognizable adversity is

25

within the FDNY's decision to rescind his invitation to be honored at Medal Day.

On December 15, 2016, the Board of Merit awarded McGrath a total of 21 points and voted to give McGrath a Class A award for his rip tide rescue. (*See* Defs.' 56.1 Stmt. ¶¶ 114, 118.) The FDNY captain that coordinated the Board of Merit meeting on that day testified that to determine which awardees would receive a medal on Medal Day, the FDNY has "this point system because we only give out . . . roughly 40 medals I want to say. So we take the highest, 40 points, and work our way down." (Raymond Arcos Deposition Transcript ("Arcos Dep. Tr.") (Dkt. 140-7) 37:6-10.) While the parties dispute whether Defendants invited McGrath to attend Medal Day, (*see* Defs.' 56.1 Stmt. ¶ 119), it is undisputed that Defendants asked McGrath to complete a "medal day winner bio form" on March 16, 2017, (*see* Defs.' 56.1 Reply ¶ 77; Mar. 16, 2017 Email from Raymond Arcos to Michael McGrath (Dkt. 140-21)). FDNY emails from March 27, 2017 where staff members were planning the upcoming Medal Day ceremony note that "[Battalion Commander] McGrath" was "the person not getting the medal," suggesting that the FDNY decided to rescind McGrath's Medal Day invitation. (*See* Mar. 27, 2017 Emails Between Thomas Coleman and Janet Kimmerly (Dkt. 140-23) at ECF pp. 3-4.) McGrath invited family members from across the United States to witness the FDNY honor him during the Medal Day ceremony where the "Mayor presents award and medal recipients with [their awards] recognizing the heroic acts performed." (*See* Pl.'s 56.1 Stmt. ¶¶ 75-76.) While the court recognizes McGrath's disappointment with the FDNY for not recognizing him at Medal Day, the court finds that this event does not constitute a "materially adverse change in the terms and conditions of [his] employment." *Weeks*, 273 F.3d at 85 (reasoning that sufficiently adverse changes include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or]

significantly diminished material responsibilities"). The court finds that the alleged rescission of his invitation was not an adverse employment action.

### f.  Arroyo Reassignment

McGrath asserts that the fact that Arroyo was later stationed by his home in Far Rockaway, Queens near the pharmacy where he picks up his medicine was retaliatory because it increased the chance of him running into her. (*See* Pl.'s 56.1 Stmt. ¶ 111 (citing McGrath Dep. Tr.).) Defendants dispute this assertion, and the only evidence McGrath cites in support of this position is his own deposition testimony, which merely restates this otherwise uncorroborated theory as an explanation for his retirement. (*See* McGrath Dep. Tr. 83:8-84:6.) McGrath has failed to provide "hard evidence" supporting retaliation on this ground that would permit the court to draw an inference in his favor. *See D'Amico*, 132 F.3d at 149. Accordingly, the FDNY's alleged reassignment of Arroyo to a station near McGrath was not an adverse employment action.

***

In sum, McGrath has failed to state a prima facie case of retaliation. Thus, the court need not proceed to the next step of the *McDonnell Douglass* burden-shifting analysis. *See Zhengfang Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 206-207 (E.D.N.Y. 2012) ("Because plaintiff fails to establish a prima facie case, the Court need not address the second two steps of the McDonnell Douglas test."). Nevertheless, the court turns to assess the evidentiary support for Defendants' argument that the FDNY's actions were supported by legitimate reasons.

27

### g. *Defendants' explanation*[12]

Defendants respond to McGrath's allegation that they failed to investigate his FDNY EEO complaint by pointing to the FDNY's EEO Policy. (Mot. at 11; Defs.' 56.1 Stmt. ¶ 72 (citing FDNY EEO Policy).) The FDNY EEO Policy provides for FDNY EEO complaints to be administratively closed and transferred to the General Law Unit when complainants file complaints with external agencies. (*See* FDNY EEO Policy at 15.) The FDNY applied that policy when it administratively closed McGrath's complaint upon learning that he had also filed complaints based on the same facts and circumstances with the NYSDHR and US EEO. (*See* Nguyen Mem.) Accordingly, the court finds this to be a "legitimate, non-retaliatory reason" for the FDNY's administrative closure of McGrath's EEO complaint. *See Zann Kwan*, 737 F.3d at 845.

---

[12] McGrath argues that Defendants have offered inadmissible documents in support of their motion, specifically arguing that the Arroyo EEO Complaint and an attorney-drafted position statement submitted to the NYSDHR in response to McGrath's NYSDHR complaint are hearsay and not based on personal knowledge. (*See* Opp'n at 4-5 (citing Arroyo EEO Complaint and NYSDHR Position Statement (Dkt. 135-5 at ECF pp. 1-8) (attaching the FDNY Policy Regarding Assignment and Transfer of Firefighter).)

The court rejects McGrath's argument as to the Arroyo EEO Complaint because it is being offered to establish that Arroyo made a complaint to the FDNY EEO Office, not to establish the truth of the contents of the complaint itself. *See Anderson v. United States*, 417 U.S. 211, 220 n. 8 (1974) ("Of course, evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement.").

The court declines to consider the NYSDHR Position Statement as evidence because it contains an FDNY attorney's written advocacy to the NYSDHR rebutting McGrath's discrimination complaint. *Pretzantzin v. Holder*, 736 F.3d 641, 651 (2d Cir. 2013) ("[T]he arguments of counsel are not evidence."). The court is permitted, however, to consider the FDNY Policy Regarding Assignment and Transfer of Firefighter attached to the NYSDHR Position Statement. (*See* FDNY Policy Regarding Assignment and Transfer of Firefighter (Dkt. 135-5 at ECF pp. 10-12).) *See Medina v. Donaldson*, No. 10-CV-5922 (VMS), 2014 WL 1010951, at *10 n. 14 (E.D.N.Y. Mar. 14, 2014).

Defendants similarly submit legitimate reasons for the substantiation of Arroyo's complaint against McGrath and the subsequent disciplinary charges brought against McGrath. According to the Final Investigative Memorandum, Arroyo alleged that McGrath "spread[] rumors that she was having sex in the firehouse, t[old] her that firefighters' wives wanted her out of the firehouse, demand[ed] that she transfer to a different FDNY facility, and engag[ed] in other misconduct." (*Id.* at ECF p. 2.) As part of Defendants' investigation into Arroyo's complaint, the FDNY EEO Office interviewed both McGrath and Arroyo twice, and interviewed 12 other witnesses. (*See* Final Invest. Mem. at ECF p. 3.) Based on this extensive investigation, the FDNY EEO Office determined as follows:

> [T]he evidence shows that it is more likely than not that: McGrath and Arroyo spent time together after work hours in a non-platonic manner; Arroyo advised McGrath that she did not wish to pursue a relationship; McGrath confronted Arroyo about unsubstantiated rumors of sexual misconduct in the workplace without addressing such alleged misconduct within his, and Arroyo's, chain of command; suggested and/or threatened Arroyo with a transfer to a different station; and recommended to Arroyo's supervisors that she be transferred to a different station. Viewing the totality of circumstances, such conduct constitutes sexual harassment in violation of the EEO Policy.

(*Id.* at ECF p. 11.) The FDNY EEO Office accordingly recommended to Fire Commissioner Nigro that: (1) "Arroyo and McGrath continue to be separated from working at the same location;" (2) "McGrath be sent to EEO training and counseled by the EEO Office;" and (3) the matter be "referred to [BIT] for appropriate discipline." (Nigro Mem. at ECF p. 16.) That referral resulted in BIT bringing several charges against McGrath under the FDNY's internal rules and regulations. (*See* Pl.'s 56.1 Stmt. ¶

58; Defs.' 56.1 Stmt. ¶ 61.) Courts of this Circuit have concluded that "a finding that an employee engaged in sexual harassment is a legitimate, non-discriminatory reason for discharging an adverse employment action." *Randolph v. CIBC World Mkts.*, 1-CV-11589 (RWS), 2005 WL 704804, at *14 (S.D.N.Y. Mar. 29, 2005) (collecting cases).

Although McGrath provides insufficient evidence to support his prima facie retaliation case as it relates to Medal Day, the evidence shows that the ultimate decision of who would be recognized on that day always rested with the FDNY's most senior leadership. (*See* Arcos Dep. Tr. 37:19-38:12, 40:3-8.) And the Fire Commissioner testified that he reviewed the proposed list of Medal Day awardees in accordance with the best interests of the FDNY:

> Q  Getting back to the Medal Day, I believe it's your testimony that Chief McGrath was dis-invited from Medal Day because of EEO substantiated conclusion; is that correct? . . .
>
> A  Well, I don't specifically recall any conversation, but . . . I would think it would be my, and it is my opinion, that it was not in the department's best interest to have given someone a medal who was very recently involved in a substantiated EEO complaint.

(Nigro Dep. Tr. 153:15-154:6.)

Accordingly, the court finds that Defendants had "legitimate, non-retaliatory reason[s]" for their conduct. *See Zann Kwan*, 737 F.3d at 845. And as McGrath fails to state a prima facie case for retaliation, *see* Part III.C.1.a, McGrath similarly fails to show that Defendants' conduct was "a mere pretext for retaliation," *id.* The court concludes that there is no genuine dispute as to any material fact that warrants a jury trial on McGrath's retaliation claims under Title VII, the NYSHRL, or the NYCRL. Fed. R. Civ. P. 56(a);

*Kemp,* 117 F.4th at 68. Accordingly, Defendants' motion for summary judgment as to these claims is granted.

### 2.    NYCHRL

The court now turns to McGrath's retaliation claim under the NYCHRL, which must be analyzed separately from his federal and state claims. *See Mihalik,* 715 F.3d at 109. While the court recognizes that the NYCHRL provides broader protections than its state and federal analogues, *see id.,* McGrath must still "establish that there was a causal connection between his protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [his] termination was pretextual or motivated at least in part by an impermissible motive," *Hughes v. Twenty-First Century Fox, Inc.,* 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018).

McGrath's retaliation claim fails even under the NYCHRL. McGrath failed to offer evidence that Defendants' conduct was reasonably likely to deter McGrath from engaging in protected activities. The evidence shows that the FDNY EEO Office substantiated Arroyo's complaint against McGrath and brought disciplinary charges against McGrath not as a result of McGrath's Agency Complaints, but because of the FDNY EEO Office's extensive fact-finding that validated Arroyo's sexual harassment allegations. McGrath's scant evidence showing a causal link between his protected activity and the alleged retaliatory actions is insufficient to defeat Defendants' motion for summary judgment. *See Reichman v. City of New York,* 117 N.Y.S.3d 280, 287 (2d Dep't 2020) (affirming summary judgment for defendants where plaintiff "did not suffer an adverse employment action based upon his engagement in a protected activity" and defendant "establish[ed] that there [was] no causal connection between the protected activity and the alleged retaliatory actions"). McGrath failed to provide "hard evidence" that Defendant's actions were "motivated at least in part by an impermissible motive." *See*

*D'Amico,* 132 F.3d at 149; *Hughes,* 304 F. Supp. 3d at 449. As the court explained *infra* at Part III.C.b, Defendants had a legitimate explanation for their conduct. *See Keles v. Yearwood,* No. 15-CV-03880 (NG), 2019 WL 1298480, at *8 (E.D.N.Y. Mar. 20, 2019) (granting defendants' motion for summary judgment on NY-CHRL claim because "defendants. . . proffered a legitimate non-discriminatory reason" for their conduct). In sum, after conducting a separate analysis for McGrath's NYCHRL claim, the court concludes that that there is no genuine dispute as to any material fact that warrants a jury trial on McGrath's retaliation claim under the NYCHRL. Fed. R. Civ. P. 56(a); *Kemp,* 117 F.4th at 68. Accordingly, Defendants' motion for summary judgment as to this claim is granted.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment. The Clerk of Court is respectfully DIRECTED to enter judgment dismissing all of McGrath's claims and close this case.

SO ORDERED.

Dated:      Brooklyn, New York
            September 22, 2025

                                   s/Nicholas G. Garaufis
                                   NICHOLAS G. GARAUFIS
                                   United States District Judge